[Crim. No. 10641. Third Dist. June 30, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN RAYMOND EAGLES, JR., Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Roy M. Dahlberg, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Robert D. Marshall and Susan Rankin Bunting, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BLEASE, Acting P. J.**—Defendant John Raymond Eagles, Jr., appeals from a judgment of conviction of three counts of vehicular manslaughter with gross negligence, in violation of Penal Code section 192, subdivision 3,[1] and from the sentence of three consecutive terms of imprisonment. He was acquitted of three counts of second degree murder. We affirm the judgment.

FACTS

Shortly before midnight on February 11, 1979, an automobile driven by defendant entered the intersection of Watt and El Camino Avenues in Sacramento at a high rate of speed and against a red light and struck another automobile, killing two of its occupants and one of the passengers in defendant's car and injuring nine other persons.[2] There were

[1]Penal Code section 192, subdivision 3, provides: "Manslaughter is the unlawful killing of a human being, without malice. It is of three kinds:

" . . . . . . . . . . . . . . . . . . .

"3. In the driving of a vehicle—

"(a) In the commission of an unlawful act, not amounting to felony, with gross negligence; or in the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence.

"(b) In the commission of an unlawful act, not amounting to felony, without gross negligence; or in the commission of a lawful act which might produce death, in an unlawful manner, but without gross negligence.

"This section shall not be construed as making any homicide in the driving of a vehicle punishable which is not a proximate result of the commission of an unlawful act, not amounting to felony, or of the commission of a lawful act which might produce death, in an unlawful manner."

[2]According to the probation report and the diagnostic study ordered by the trial court pursuant to Penal Code section 1203.03, nine others were injured in the collision, some seriously. In all, five cars were involved in the accident.

numerous witnesses to the collision and to defendant's driving conduct immediately prior thereto.

Frederick Roloff testified that as he completed a left turn from Auburn Boulevard onto Watt Avenue, defendant's car passed him at a speed of about 80 miles per hour. Recovering from his "initial shock," Roloff accelerated to about 60 miles per hour, but defendant continued to pull away at a speed Roloff estimated as 90 to 100 miles per hour,[3] during which defendant "went through" a red light. From a parking lot off Watt Avenue James Byrd saw defendant's automobile "streak" by at a speed he estimated as "going faster than eighty," perhaps "over a hundred miles an hour."

As Kathleen Hicks approached the intersection of Watt and El Camino, traveling southbound on Watt, she observed defendant's car as it came up behind her "very rapidly," passed her "really flying . . . going a good 70 or 75" and proceeded into the intersection against a red light, without braking. Michael Bard was stopped in a northbound lane on Watt waiting for the light to change. He estimated defendant's car was traveling "[p]robably between 60 and 70 miles an hour." James Giannelli, also stopped in a northbound lane on Watt, thought defendant's car was going "about 75." Edward Burger, similarly situated, estimated its speed at 60 to 65 miles per hour. The posted speed limit was 35 miles per hour.

A Highway Patrol Multidisciplinary Accident Investigation team reconstructed the accident on the basis of skid marks, scratches and gouges in the pavement and on the damage to the vehicles and where they came to rest. Dewey Brown, a California Department of Transportation traffic engineer assigned to the team, thereupon calculated the speeds of the vehicles upon impact, concluding that defendant's Camaro was traveling 62.46 miles per hour and the Pinto he struck was traveling 36.77 miles per hour, "plus or minus two miles an hour." Another member of the investigatory team, Aelred Sauer, a Highway Patrol safety inspector and mechanic with special expertise regarding motor vehicle brakes, testified that in his opinion the brakes and brake lights on defendant's car were operable at the time of the collision. A highway patrolman testified that the absence of skid marks before the point of impact indicated defendant's brakes were not applied.

[3]Roloff testified that he was an experienced race and car rallye driver and that the ability to accurately estimate the speeds of other cars was important in these activities.

Defendant testified and admitted exceeding the posted speed limit on Watt Avenue, but insisted that "[e]verybody travels that fast at that time of night." He denied driving through a red light at the intersection of Watt Avenue and Auburn Boulevard and estimated that he was traveling between 55 and 60 miles per hour when he passed Roloff. He also denied that the light was red at Watt and Whitney when he drove through it. He admitted accelerating at one point to "about 70" in response to a comment that his car was "gutless," but said he had slowed to about 55 or 60 miles per hour as he approached El Camino Avenue, where he noticed traffic was stopped for a red light. At that moment one of his passengers asked him to change a tape and he looked down "to see which tape to put in." When he looked up, the stopped cars were "close." As he braked, his automobile "jerked" to the left and he swerved around the cars and into the intersection at a speed of about 50 miles per hour.

William Rennert, a passenger in defendant's car, estimated defendant was driving 40 to 45 miles per hour along Watt Avenue, but that he "kicked up the speed a little bit" to 55 or 60 in response to the derogatory comment on his car's performance and they approached El Camino Avenue at a speed of about 55 miles per hour. From his position in the back seat he could not see the traffic lights, but no one made any comment regarding them. He did not feel any braking or deceleration as they entered the intersection of Watt and El Camino.

In an effort to corroborate his denial that he passed through red lights at Auburn Boulevard and Whitney Avenue, defendant produced an accident investigator who testified, on the basis of signal "timing sheets" and experiments he conducted retracing Roloff's progress onto and along Watt Avenue, that the signals were timed so that the lights must have been green for defendant.[4] The investigator also questioned the accuracy of Roloff's estimate of the speed of a passing car at night. He did the same in regard to witness Byrd's estimate of defendant's speed as he passed the parking lot in which Byrd was standing; he performed an experiment purporting to show that defendant's speed must have been about 60 miles per hour if Byrd was able to walk out of the parking lot to the sidewalk and observe the car for as long as he said he did.

[4]He indicated that the light at Auburn Boulevard was set to change to green for southbound traffic on Watt in the time it took a car to turn onto the avenue and that the light at Watt and Whitney could not have stayed red for as long as Roloff recalled,

Defendant also produced an expert witness, William R. Neuman, a professor of civil engineering at California State University, Sacramento, who calculated, based on estimates of the weight of the cars and the manner in which they skidded, that defendant's car was traveling 54.47 miles per hour and the Pinto 37.16.

## DISCUSSION

### I

Defendant was found guilty of three counts of vehicle manslaughter, which the jury was told was the killing of a human being proximately caused in the driving of a vehicle by the commission of an unlawful act, a violation of the basic speed law, with gross negligence.[5] It was instructed on the basic speed law (Veh. Code, § 22350) and traffic control law (Veh. Code, § 21453) and that a violation of each is inherently dangerous to human life or safety.

Defendant makes no claim on appeal that his driving conduct was not unlawful or inherently dangerous to human life or safety. Rather, he contends the trial court erred in preventing him from presenting evidence of the average speed of traffic observed on Watt Avenue on a

suggesting that from a distance Roloff might have mistaken a red light for traffic turning left for the one governing through traffic.

[5]The jury was instructed: "Defendant is charged in (Count 2, 4, & 6 of) the information with the commission of the crime of vehicle manslaughter, a violation of Section 192 of the Penal Code.

"The crime of vehicle manslaughter is the unintentional but unlawful killing of a human being in the driving of a vehicle.

"In order to prove the commission of the crime of vehicle manslaughter, each of the following elements must be proved:

"1. That in the driving of a vehicle, a human being was killed.

"2. That the killing was unlawful, and

"3. That the unlawful act committed was a proximate cause of the person killed.

"A killing is unlawful when a person commits an act inherently dangerous to human life or safety, amounting to a misdemeanor or an infraction, as will be later defined, or negligently commits an act ordinarily lawful which might produce death.

"If you find that the defendant is guilty of manslaughter as thus defined to you, you must also find whether the act causing the death was done with or without gross negligence, and you must declare your finding in that respect in your verdict.

"If you find that the defendant was guilty of manslaughter in the driving of a vehicle, but entertain a reasonable doubt as to whether the act causing death was committed with gross negligence or not, it would then be your duty to find that it was committed without gross negligence." (CALJIC No. 8.90 (4th ed. 1979) pp. 339-340.)

night sometime after the accident to establish *the* "standard of care" required for gross negligence.[6]

Defendant argues for the first time on appeal that "the question whether or not [his] driving was marked by a gross 'failure to exercise care' was one of fact for the jury alone and . . . the actions of other similarly situated drivers was absolutely relevant to that factual determination." He now agrees with the trial court that the conduct of other drivers is not *the* measure of negligence.

Defendant's argument comes too late. "It is the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection at the trial on the ground sought to be urged on appeal. [Citations.]" (*People* v. *Welch* (1972) 8 Cal.3d 106, 114-115 [104 Cal.Rptr. 217, 501 P.2d 225]; see also *People* v. *Richards* (1976) 17 Cal.3d 614, 618, fn. 1 [131 Cal.Rptr. 537, 552 P.2d 97]; *People* v. *Privitera* (1979) 23 Cal.3d 697, 710 [153 Cal.Rptr. 431, 591 P.2d 919, 5 A.L.R.4th 178].) Defendant tendered the issue on an improper theory resulting in a ruling predicated upon the theory. He cannot switch horses on appeal. Assuming a correct theory could have been tendered, the court nonetheless could have excluded the evidence.[7]

---

[6]The following colloquy shows defendant's theory:

"THE COURT: [Y]ou assume by your argument that the average speed of vehicles on a given occasion which the witness as a percipient witness observed vehicles traveling along a particular stretch of highway is *the* standard.

"Suppose you had 20 careless—would you say, for example, if there are 20 people that were observed by this witness going 120 miles an hour down the road, would you say that that would then set the standard?"

"[DEFENDANT'S COUNSEL]: *Yes*, your Honor, if it was on five different occasions and more than one car, I would say that we got a standard established at that point.

" . . . . . . . . . . . . . . . . . . .

"THE COURT: . . . Because you indicate that it's a standard that you seek to employ, to wit, what the average speed of a given number of people proceeding down this stretch of the roadway, on a given occasion, sets the standards. To that extent, to that degree, the Court respectfully indicates to you that it does not accept that as being the establishment of a standard." (Italics added.)

[7]Given the serious questions concerning the similarity of driving conditions on different nights, the accuracy of the investigator's observations and the strong possibility that admission of the evidence would confuse rather than clarify the issue of defendant's guilt, in view of the required inferential steps from the average speed of cars on a single night to "customary" speed to, finally, the standard of due care, we have no doubt that the court could have excluded the proffered evidence in the exercise of its considerable discretion. (Evid. Code, § 352; see *Schauf* v. *Southern Cal. Edison Co.* (1966) 243 Cal.App.2d 450, 455 [52 Cal.Rptr. 518].)

In any event, defendant was not prejudiced by the exclusion of the evidence. He was permitted to testify, over and over, that, in his experience (he had driven the same route "[a] lot of times"), "[e]verybody travels that fast at that time of night." He said he noticed several other cars traveling at the same speed, 55 to 60 miles per hour, on the night of the accident. He considered it safe to drive at that speed on Watt and always did so, in keeping with the flow of traffic. Moreover, on cross-examination, prosecution witness Roloff stated that in his opinion it was safe, for him at least, given his experience and his Porsche, to drive 60 miles per hour on Watt Avenue. And another prosecution witness testified that "cars do whiz by on Watt Avenue, . . . all the time" and that he had seen cars exceeding the speed limit there before. He estimated that the other cars he observed that night were traveling between 40 and 50 miles per hour.

Finally, the overwhelming nature of the evidence against defendant renders it highly improbable that he was prejudiced by the error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) A number of eyewitnesses saw defendant traveling at speeds far in excess of the posted speed limit on Watt Avenue. One of them tried to catch up with defendant, but defendant's car continued to pull away from him rapidly, though the witness reached a speed of 60 miles per hour. Even the evidence most favorable to defendant indicates that his car entered the intersection of Watt and El Camino Avenues against a red light and at a speed 20 miles per hour in excess of the posted speed limit, and the prosecution's expert said it exceeded the limit by almost *30* miles per hour. It is clear, too, that contrary to defendant's testimony he did not attempt to stop at the red light; there were no skid marks before the point of impact, an eyewitness testified that the car's brake lights, which were operational, did not come on, and a passenger in defendant's car said that he felt no braking or deceleration as the car entered the intersection. We can hardly imagine a more compelling showing of gross negligence. (See *People* v. *Pfeffer* (1964) 224 Cal.App.2d 578, 580-581 [36 Cal.Rptr. 838].)

II

The trial court permitted the prosecution to present evidence of defendant's reckless driving during the afternoon before the accident, including testimony that he was speeding up to 85 miles per hour on Highway 50, weaving in and out of traffic and that he forced a car off the road while suddenly exiting at an off ramp. The prosecution prof-

fered the evidence as relevant to defendant's state of mind involving the charges of second degree murder of which he was acquitted, characterizing that as his knowledge of the life-threatening dangers of excessive speed.[8] The court rejected defendant's *in limine* motion to exclude the evidence pursuant to Evidence Code section 1101, subdivision (b),[9] on the ground the evidence was relevant to show defendant's "intent"[10] several hours later when the accident occurred. The evidence was properly admitted on the ground asserted by the prosecution.

Evidence of a prior uncharged offense may be offered to prove a disputed fact relevant to the offense charged, such as knowledge, but not to prove the defendant's disposition to commit the offense. "[T]he fact sought to be proved may be either an ultimate fact in the proceeding or an intermediate fact 'from which such ultimate fact[] may be presumed or inferred.'" (Fns. omitted.) (*People* v. *Thompson* (1980) 27 Cal.3d 303, 315 [165 Cal.Rptr. 289, 611 P.2d 883].) "In ascertaining whether evidence of other crimes has a *tendency* to prove the material fact, the court must first determine whether or not the uncharged offense serves 'logically, naturally, and by reasonable inference' to establish that fact.' (*People* v. *Schader* [(1969)] 71 Cal.2d [761,] 775 [80 Cal.Rptr. 1, 457 P.2d 841] . . . .)" (Fn. omitted.) (*Thompson*, at p. 316.)

[8]The prosecuting attorney said: "What we are trying to prove through this evidence is that John Eagles undertook, during the course of that day, a course of conduct involving such reckless driving with an automobile that he must have perceived that harm and high degree of human risk was inevitable from that continued conduct. He has almost driven someone off the road and caused an accident on that day, yet he continues to drive in that fashion causing two of his passengers to ask to be taken home. On that same day, he continues to drive in that very same fashion, causing exactly the kind of harm that could be perceived."

[9]Evidence Code section 1101 provides: "(a) Except as provided in this section and in Sections 1102 and 1103, evidence of a person's character or a trait of his character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his conduct) is inadmissible when offered to prove his conduct on a specified occasion. "(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts. "(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

[10]"Intent" is not a mental state required for proof of either implied malice or gross negligence. (See *People* v. *Watson* (1981) 30 Cal.3d 290, 296-297 [179 Cal.Rptr. 43, 637 P.2d 279].) However, the prosecutor made no such claim (see *ante*, fn. 8) and we read the trial court's reference to "intent" as meaning the mental state of knowledge.

Here, the evidence of prior driving conduct was offered to prove an intermediate fact (knowledge that conduct is life threatening) necessary to the establishment of the ultimate fact of implied malice, an element in the charges of second degree murder. "[*M*]*alice* may be implied when a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life. (See *People* v. *Sedeno* (1974) 10 Cal.3d 703, 722-723 ...; *People* v. *Phillips* (1966) 64 Cal.2d 574, 587 ....)" (*People* v. *Watson* (1981) 30 Cal.3d 290, 296 [179 Cal.Rptr. 43, 637 P.2d 279].) "[T]here must be actual knowledge ... of the peril to be apprehended ... coupled with a conscious failure to act to the end of averting injury." (*Kastel* v. *Steiber* (1932) 215 Cal. 37, 47 [8 P.2d 474].)

Evidence of excessive speed resulting in a near collision is relevant to knowledge of risk, "an actual awareness of the great risk of harm" of excessive speed. (See *People* v. *Watson, supra*, 30 Cal.3d at p. 301 ["Defendant drove at highly excessive speeds through city streets, an act presenting a great risk of harm or death. Defendant nearly collided with a vehicle after running a red light ...."]; see also *People* v. *Costa* (1953) 40 Cal.2d 160, 166-167 [252 P.2d 1].) Defendant's prior driving conduct occurred on the same day and some nine hours before the killings. Although it took place on a freeway with speed limits different than on Watt Avenue, it involved driving at excessive speeds, resulting in a near accident. We agree with the prosecutor at trial that it is a permissible inference that "[w]hen you're driving around ... at a high rate of speed, almost cause an accident, you must see what the risk of harm is that can follow it." What defendant knew in the afternoon he undoubtedly knew that night before the fatal accident. The evidence was admissible to prove implied malice.

Defendant was acquitted of the charges to which the evidence was relevant. But he argues that the evidence was *in*admissible on the issue of gross negligence, an element of the offenses for which he was convicted. We do not reach that issue for the following reasons. ■ Evidence that is relevant and admissible for one purpose may be admitted for such purpose even though it is inadmissible for another purpose. (Evid. Code, § 355; 1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 20.2, pp. 467-468; see *Allen* v. *Toledo* (1980) 109 Cal.App.3d 415 [167 Cal.Rptr. 270].) "When evidence is admissible for a limited purpose ... a party who could be adversely affected if the evidence is not so restricted is entitled to have the trial judge restrict the evidence to the limited purpose ... and instruct the jury accordingly." (1 Jefferson,

*supra*, at p. 468; Evid. Code, § 355; see *Allen* v. *Toledo, supra*, 109 Cal.App.3d 415.) Defendant implies that it is the court's *sua sponte* duty to give the limiting instruction. That is not the case. The limiting instruction is available only "upon request" of the party affected. (Evid. Code, § 355.) No such request was made. Accordingly, we do not consider whether the challenged evidence also tends to prove an intermediate fact from which gross negligence may be inferred. (But see *People* v. *Costa, supra*, 40 Cal.2d at pp. 166-167.)

III

Defendant objects to the trial court's instruction based upon Penal Code section 193, subdivision (c),[11] that if the jury found defendant guilty of manslaughter *with* gross negligence it should either recommend that he be sentenced to county jail or make no recommendation, but if it found him guilty of manslaughter *without* gross negligence it should make no recommendation.[12] He claims that this instruction implicitly informed the jury that the offense of manslaughter without gross negligence is punishable by imprisonment in county jail only and encouraged it improperly to consider punishment in the course of its deliberations of his guilt.[13]

[11]Penal Code section 193, subdivision (c), as applicable, provided: "A violation of subsection 3 of Section 192 of this code is punishable as follows: In the case of a violation of subdivision (a) of said subsection 3 the punishment shall be either by imprisonment in the county jail for not more than one year or in the state prison, and in such case the jury may recommend by their verdict that the punishment shall be by imprisonment in the county jail; in the case of violation of subdivision (b) of said subsection 3, the punishment shall be by imprisonment in the county jail for not more than one year. In cases where, as authorized in this section, the jury recommends by their verdict that the punishment shall be by imprisonment in the county jail, the court shall not have authority to sentence the defendant to imprisonment in the state prison, but may nevertheless place the defendant on probation as provided in this code." (As amended by Stats. 1978, ch. 579, § 3, p. 1981.)

[12]The jury was instructed: "If you should find that the defendant is guilty of manslaughter and that the act causing death was done with gross negligence, you may recommend by your verdict that the punishment shall be by imprisonment in the county jail, or you may return a verdict without recommendation as to place of imprisonment, leaving the matter of punishment to the court. If you should find that the defendant is guilty of manslaughter, but that the act causing death was done without gross negligence, you shall make no recommendation as to the punishment." (CALJIC No. 8.97 (4th ed. 1979) p. 348.)

[13]CALJIC No. 17.42 (4th ed. 1979), page 293, adjures: "In your deliberations the subject of penalty or punishment is not to be discussed or considered by you. That is a matter which must not in any way affect your verdict." This instruction was not given in the present case, evidently because the "Use Note" accompanying it directs that it

We do not reach the issue tendered because we find that the error alleged is, in any event, harmless. We also note the statutory authority of the jury to recommend punishment has been repealed, effective January 1, 1982. (Stats. 1981, ch. 110, § 1.)

To merit reversal of defendant's conviction it must be reasonably probable that a different result would have obtained if the claimed error had not occurred. (*People* v. *Watson, supra,* 46 Cal.2d at p. 836.) Our review of the evidence has convinced us that the verdict would have been the same without the claimed error. Defendant's driving conduct presents a paradigm case of gross negligence. If the jury considered a jail term too lenient a sentence, it undoubtedly did so for the same reason that led it inescapably to a finding of gross negligence.

IV

Defendant also contends that the trial court violated Penal Code section 654[14] in sentencing him consecutively for the three manslaughter convictions, claiming that all three deaths resulted from a single, indivisible course of conduct. It is well settled that section 654's prohibition of multiple punishment is inapplicable where the criminal conduct involves "violence with the intent to harm more than one person or by a means likely to cause harm to several persons . . . ." (*Neal* v. *State of California* (1960) 55 Cal.2d 11, 20 [9 Cal.Rptr. 607, 357 P.2d 839]; *People* v. *Miller* (1977) 18 Cal.3d 873, 885 [135 Cal.Rptr. 654, 558 P.2d 552].) Defendant argues, however, that where the acts of violence are not intentional, but the result of gross negligence, the rule recognized in *Neal* is inapplicable. We disagree.

In *People* v. *De Casaus* (1957) 150 Cal.App.2d 274 [309 P.2d 835], an argument essentially the same as defendant's was rejected, the court upholding consecutive one-year jail sentences for six vehicular manslaughter convictions. The holding was reaffirmed in *In re Frank F.* (1979) 90 Cal.App.3d 383, 386-387 [153 Cal.Rptr. 375], in dicta, in rejecting the minor's contention that Vehicle Code section 23101 was

not be given in vehicular manslaughter cases, since the jury recommends punishment in such cases.

[14]Penal Code section 654 provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other."

intended to supplant the vehicular manslaughter statute with regard to intoxicated drivers. (See also *People* v. *Lockheed Shipbuilding & Constr. Co.* (1977) 69 Cal.App.3d Supp. 1, 12-13 [138 Cal.Rptr. 445] [upholding multiple punishment for violation of former Lab. Code, § 6416 (repealed by Stats. 1973, ch. 267, § 1, p. 664; ch. 993, § 93, p. 1938, eff. Oct. 1, 1973), grossly negligent failure to provide a safe employment resulting in death, where conditions were based on an explosion which resulted in 16 deaths].) We think the rationale of the rule permitting multiple punishment where multiple victims are involved, the need "to insure ... defendant's punishment will be commensurate with his criminal liability" (*Neal* v. *State of California, supra*, 55 Cal.2d at p. 20), supports these holdings. The "outrage" to which the vehicular manslaughter statute addresses itself was perpetrated on three victims. (see *People* v. *Lobaugh* (1971) 18 Cal.App.3d 75, 79 [95 Cal.Rptr. 547].) Defendant was not grossly negligent toward a single potential victim; rather, his utter disregard of people's safety endangered a large number of persons and killed three of them.

Defendant attempts to analogize this case to *People* v. *Lobaugh, supra*, 18 Cal.App.3d 75, which held that a defendant may be convicted of only one violation of Vehicle Code section 23101, driving under the influence of liquor resulting in injury to another, though several persons are injured. That decision is inapposite. The court there observed: "Unlike the usual 'multiple victim' case, here the fundamental concern of the state is not the outrage done the victims, but rather the prevention of 'drunken driving' and the punishment of those who so conduct themselves." (*Id.*, at p. 79.) Penal Code section 192, conversely, is entirely concerned with the "outrage done the victims."

The judgment is affirmed.

Reynoso, J.,* and Young, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 25, 1982.

---

*Assigned by the Chairperson of the Judicial Council.