[Crim. No. 44425. Second Dist., Div. Seven. Aug. 23, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES LEE MILHAM, Defendant and Appellant.

488

**COUNSEL**

James A. Stotler, Alicemarie Stotler and Stotler & Stotler for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert F. Katz, William R. Weisman and Carol Wendelin Pollack, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BEVERLY, J.\*—**

### Introduction

Appellant was charged by information with three counts: count I alleged a violation of section 23101, subdivision (a), of the Vehicle Code, on or about December 29, 1981. It was further alleged in that count that while under the influence of intoxicating liquor and under the combined influence of intoxicating liquor and a drug, appellant drove a vehicle upon a highway, and that in so driving, did an act forbidden by law in violation of Vehicle Code section 21662, thereby proximately causing bodily injury to Wendy Milham and Thomas Wilcox. Count II alleged a violation of section "192.3, subdivision (a)" of the Penal Code, vehicular manslaughter. The named victim in that count, Wendy Milham, was appellant's pregnant wife. Count III alleged a violation of that same section, with the named victim, Thomas Wilcox, a passenger of the same vehicle as appellant and his wife. Appellant was found guilty of count I, and was also found guilty of counts II and III as misdemeanors.

### Trial

On December 29, 1981, Theodosia Milham (Theo), appellant's eight-year-old daughter, and also a passenger in the car at the time of the fatal accident, lived with her mother, Wendy, and appellant in Torrance. She testified that her father filled bullets with gunpowder that morning, with the help of a friend named Tom (Thomas Wilcox). During that time her father was drinking "Tequila Sunrises." They then left for the mountains and, on the way, stopped at a liquor store where both appellant and Tom bought beer and a couple of tequila sunrises. When they arrived at the location in the mountains for target shooting, they looked for trash to build a fire because it was dark. Target shooting was done at cans which were set up on a hill. During this time appellant and Tom were drinking. Theo testified that she thought Tom was drinking beer and appellant was drinking tequila sunrises. The reason she thought appellant was drinking tequila sunrises was because he told her so, and she saw the labels on the cans from which he drank, which said "Tequila Sunrise."

Theo did not see how many drinks appellant took from the can. She knew Tom was drinking beer because that was the only thing he drank, and she also saw the can from which Tom was drinking. Appellant drank a little bit

---

\*Assigned by the Chairperson of the Judicial Council.

before and a little bit after the target practice, and he drank while shooting the guns. The shooting lasted for "a long time."

After they finished shooting, they got in the car and left the area. Theo was in the back seat lying on her mother's lap, appellant was driving, and Tom was in the front passenger seat. Appellant and Theo's mother began to argue in the car. Just before the accident, appellant was facing Theo's mother in the back seat. The last thing Theo remembered seeing was appellant turning and facing her. She felt a big bump. They started bouncing up and down the road, and the car then bounced end over end. Theo next remembered waking up in a yucca plant with a broken arm and a couple of scratches. She called out, but no one answered until she called out several more times and appellant woke up. He was right under her.

When asked if she felt anything unusual before the car went off the road, Theo said she felt a big rock in the road.

Dr. Marianne Bette testified that she was driving from Pasadena to Lancaster and noticed a small two-car collision on the road. As she drove toward a telephone, she saw a man staggering in the street and waving her down. She pulled over, thinking he was in the previous accident she had seen. The man told her that his wife and kids were over the side of the road and that he had just climbed up. Dr. Bette got out and tried to see where the car was, but could see nothing. There was a little girl crying hysterically down the hill. She saw that appellant had a laceration on his left thigh, and was walking around without his shoes on. She felt his head and noticed liquor on his breath. In her opinion, he was not sober. She believed that this occurred about 8:30 p.m. Dr. Bette remained at the scene for approximately two and one-half hours. She further noted that appellant had no glasses on, that the laceration on his thigh was approximately four inches in length, and that his clothes were dirty and dusty. There was also crusting of blood on appellant's face. She did not see a laceration on the back of his head, but noticed drops of blood the next day on the back of her car seat where appellant had been sitting. In Dr. Bette's opinion, appellant was drunk. He was staggering in the street, had a strong smell of alcohol about him, and was slurring his words. This was her opinion despite the other possible causes that could give rise to some of the same signs which may have resulted from appellant's injuries.

Curtis D. Slocum, a paramedic for the Los Angeles County Fire Department, testified that between 8:30 and 9 p.m., on December 29, 1981, he responded to a call approximately four miles north of Angeles Forest Highway. He was the passenger in the emergency vehicle, and as such responsible for the patient. His partner, Wayne Lee, was the driver, and thus was

responsible for radio calls and paperwork. When Mr. Slocum examined appellant he saw many lacerations and abrasions, with 1 three-to-four-inch laceration on appellant's left thigh. He also observed a laceration of appellant's scalp where blood had coagulated. Appellant appeared to be oriented as to place, time and recognition, with a little slurred speech. He also noted a moderate to strong odor of alcohol on appellant's person. He spent 45 minutes with appellant but never saw him walk around. The only additional symptom of intoxication noticed by the witness was slurred speech.

Officer Diana Sanchez of the California Highway Patrol, investigated the accident on December 29, 1981. Upon her arrival at the scene, she made contact with the paramedics, sheriff's deputies, and other Highway Patrol officers who had arrived on the scene. At the scene of the accident she measured approximately 97 feet of skid marks which began on the northbound traffic lane, gradually curved into the southbound traffic lane onto a dirt shoulder approximately 8 feet wide, and ended where the vehicle had gone over the side. In examining these skid marks, Officer Sanchez formed the opinion that the driver of the vehicle took a curve at an excessive speed, which caused the vehicle ultimately to go onto the opposite side of the road and in the opposing traffic lane. The car continued southbound in the northbound traffic lane and swerved back into the southbound lane onto the dirt shoulder, and ultimately over the side. After the accident, Officer Sanchez drove the same curve, and noticed that she could not maintain a speed in excess of 40 to 42 miles per hour without the rear end of her car beginning to fishtail.

Officer Sanchez approached the ambulance where appellant was seated, after being told by the paramedics that a victim of the accident was inside the ambulance. Upon approaching the ambulance, Officer Sanchez stated, "Hello. Were you involved in the accident?" Appellant responded that he was, and that he had been driving the car. He also said that he thought he had killed his wife. He told the officer that he was going southbound on Angeles Forest Highway at approximately 55 miles per hour, and that for some unknown reason he went over the cliff. Appellant stated that he blacked out for an unknown period of time after the accident occurred but later managed to crawl up the cliff and flag down a motorist for assistance.

Officer Sanchez smelled a moderate to strong odor of alcohol on appellant and examined his eyes while he was still in the ambulance. She held out her finger approximately seven inches from his face, and asked appellant to follow her finger from left to right, keeping his head perfectly still and moving only his eyes. At that time she noticed that he had horizontal nystagmus, which was indicative of alcohol intoxication. His eyes were also bloodshot and watery. She then asked appellant to exit the ambulance to

perform some field sobriety tests. She asked appellant if he felt up to it, and he replied he did. He stated that he had a laceration on his left leg, and did not feel that he could stand on that leg alone, but believed that with his right leg he would have no problem. She asked him if there were any physical defects that might prevent him from performing tests in reference to his feet, ankles, hips, arms or anything additional, and appellant replied no. He was asked to perform the tests on a dry, flat, asphalt roadway in the light of the high beams of the patrol car and Officer Sanchez' flashlight. She may have also used her spotlight. There was also lighting from other vehicles including the sheriff's patrol car.

Officer Sanchez had to explain the tests to appellant more than two times. She first asked appellant to perform the modified position of attention. The other two tests were the standing-on-one-foot test and the finger-to-nose test. On the first test, appellant began to weave in a circular motion approximately four inches off center. When asked to stand on his right leg, appellant fell back and Officer Sanchez had to catch him. Upon performing the finger-to-nose test, appellant first touched the bottom of his nostrils and moved his finger back up to the tip. With his right finger he touched the bridge of his nose with the first joint. With the left finger, he touched the first joint to the bottom of the nostrils. Based on the field sobriety tests and the observed condition of appellant, Officer Sanchez placed him under arrest for being under the influence of an alcoholic beverage. The observations which led her to that conclusion included appellant's slow and thick speech, bloodshot and watery eyes, horizontal nystagmus, lack of coordination, and failing the field sobriety test. Her opinion was not altered considering appellant's physical condition as a result of the accident.

Though it was difficult to make measurements because of the inaccessibility of the area, Officer Sanchez estimated that appellant's vehicle was located 400 feet below the roadway.

Appellant indicated to Officer Sanchez that his last drink was approximately two beers. She did not ascertain whether the beer was consumed with any food. Appellant had nothing to drink since the accident. The field sobriety tests were given at approximately 9:55 p.m. The results of the tests were recorded five minutes after they were given as she sat in her patrol car at the scene. Appellant was transported by ambulance to Verdugo Hills Hospital, where a sample of his blood was removed at approximately 11:30 p.m.

Dewayne Kenneth Beckner, a criminalist employed by the Los Angeles County Sheriff's Department, testified that he had been a criminalist for over nine years and was familiar with the gas-chromatograph, the instru-

ment used for analyzing blood to determine its alcohol content. He tested two samples of appellant's blood. The first test result was .11 percent, and the second .11 percent. It was his opinion, based on his experience, that anyone with a blood alcohol level of .10 percent was under the influence of alcohol with respect to driving. Five percent of those persons who have nystagmus will have a natural nystagmus, and 95 percent will have nystagmus due to being under the influence of alcohol. He further testified that, hypothetically, an individual male, weighing approximately 135 pounds, who consumes two 12-ounce cans of beer between 7:30 and 8:30 p.m. and has no more alcohol after that, would in his opinion have a blood alcohol level of .00 percent at 11:30 p.m. Further, if a person had a blood alcohol level of .11 percent at 11:30 p.m., and had consumed no alcohol since 8:30 p.m., had exhibited slow speech, staggering gait and moderate to strong odor of alcohol at 8:30 p.m., and continued to exude a moderate to strong odor of alcohol between 9:45 and 10 p.m., was incapable of successfully performing the field sobriety tests aforementioned, and displayed nystagmus and bloodshot, watery eyes, it was Mr. Beckner's opinion that that person was "on his way down" in terms of blood alcohol level, and that he would have been under the influence of alcohol, and not a safe driver at 8:30 p.m. He would have considered the field sobriety test to have been inconclusive given the possible effects of the accident.

By stipulation it was established that: blood was taken from appellant at 11:30 p.m. on December 29, 1981; Wendy Ann Milham, age 27, and Thomas Edward Wilcox, age 26, did die on December 29, 1981, from multiple traumatic injuries sustained in the accident on Angeles Forest Highway; on December 29, the temperature range was between 57° and 46°, and the reported rainfall was two-hundredths of an inch over the 24-hour period on December 29.

*Defense*

Wayne Robert Lee, a paramedic with the County of Los Angeles Fire Department, responded to the accident scene. He attended appellant at the scene. He did not talk to appellant himself, but heard appellant talking to his partner for five to ten minutes. Though he did smell an odor of alcohol about appellant, he did not hear anything unusual about his speech nor see any signs of intoxication.

Dr. Naresh Jain, a toxicologist and a professor of pharmacology and toxicology at the USC School of Medicine, testified that he performed an examination of appellant's blood sample on May 5, 1982, and that the results of his analysis was that the sample contained .09 percent alcohol. He further testified that it would be reasonable to expect a sample of blood to lose

alcohol each time it was exposed to the air and thus to expect that the sample would have a slightly lower alcohol content than it would had it been kept in a sealed condition and tested only once. If a 135-pound person were to have a .09 percent blood alcohol reading at 11:30 p.m., having consumed no alcohol during the 3-hour period prior to the test, and assuming all of the drinks were consumed at 8:30 p.m., Dr. Jain testified that he would conclude that appellant had 6½ drinks at 8:30 p.m. He could not tell what blood alcohol level appellant had at the time of the accident because he did not know the time of the accident or the time of the drinking.

John Clement, a consulting engineer registered in the State of California, testified that he examined the Volkswagen Rabbit in which appellant and the victims were riding, and noticed that the right rear tire had a slight ding on the inside of the rim and some on the outside. There was one mark which appeared to have been caused by a solid object stationary in the roadway and the wheel striking it. There were also scuff marks on the side of the tire which indicated that they had been caused by an object in the roadway. He concluded that something had struck the outside of the tire while the car was in motion, and that the outside of both right tires had struck some object in the roadway.

Mr. Clement concluded that the brakes were in good working condition before the accident and that there was no defect in the steering system prior to the accident. Though not able to fully test the system because of excessive damage, he found no defects which definitely existed prior to the accident. The aforementioned characteristics of the rims of the right tires indicated that the car struck some large object in the roadway which could have caused loss of control. He estimated that appellant was going approximately 49 miles per hour at the time of the accident if the friction factor was .7; assuming a .5 friction factor, 46 miles per hour, and assuming a .5 friction factor, 43 miles per hour. It was his conclusion that the vehicle was going 20 miles per hour when it went over the side of the road. The wheels did not roll over the rock, but rather hit the side of the rock. That kind of collision between a rock and a wheel could cause the vehicle to move sideways a small amount, but would not cause a bouncing motion unless the wheels actually ran over the rock. The condition of the wheels indicated that they hit more than one object.

Dr. F. Raymond Kemp, a licensed physician and surgeon since 1952, examined appellant on December 31, 1981, and noticed contusions and abrasions. He formed the impression that appellant was suffering from a possible concussion syndrome. There was a 50 percent likelihood that appellant had suffered a concussion. During the examination, appellant was alert and had no signs of concussion except for his complaint of a headache.

James W. Box, a private investigator, examined the accident scene on March 27 and May 1, 1982, and measured the degree of the curve where the accident occurred. He found the curve to measure approximately 82°, and that the distance from the shooting range to the side of the accident was 2.7 miles.

Mrs. Jeanie Ward, appellant's sister, saw appellant in the emergency room of the Verdugo Hills Hospital for two to three minutes, approximately forty-five minutes after she received a phone call on December 29, 1981, and saw no signs of intoxication.

Mrs. Rose Marie Milham, appellant's mother, also saw appellant there at that time and saw no signs of intoxication.

It was stipulated that sunset occurred at 4:52 p.m. on December 29, 1981.

### Discussion

### I. *Evidence of Appellant's Blood Alcohol Reading*

■ Appellant contends that it was error for the court to allow into evidence his blood alcohol reading of .11 on the premise that there was a six-hour hiatus between the time of the accident and the drawing of appellant's blood, as well as a four-hour gap between the driving and the time of arrest. Appellant bolsters this argument by pointing out that the later amendment of the Vehicle Code, adding section 23152, subdivision (b), provides for a blood alcohol test to be given within three hours after driving.

This contention has two flaws: first, the evidence is not clear as to the amount of time that elapsed from the occurrence of the accident to the drawing of appellant's blood. It was stipulated that on the date in question sunset was at 4:52 p.m. Appellant's blood was drawn at 11:30 p.m. Appellant was found on the highway by a passing motorist at approximately 8:30 p.m. According to his daughter, Theo, it was already dark when they arrived at the shooting range, causing them to have to build a fire. Appellant was shooting and drinking for some unknown period of time at that location before driving away. Secondly, since the aforementioned "three-hour rule" was not in effect at the time of appellant's trial, the requirement was that the test be incidental to both the offense and to the arrest with no *substantial* time lapse. (*People* v. *Schrieber* (1975) 45 Cal.App.3d 917, 921 [119 Cal.Rptr. 812].) "Moreover, the greater the elapse of time the greater the benefit to the defendant, as the alcohol in his system becomes dissipated by the normal body processes." (*Id.,* at p. 922; *In re Martin* (1962) 58 Cal.2d 509, 512 [24 Cal.Rptr. 833, 374 P.2d 801].) Appellant was in no way

precluded from producing such testimony or evidence as may be available to him to prove his relative sobriety at the time of the alleged offense as compared to his condition at the time of the taking of the test. (*People* v. *Schrieber, supra,* at p. 922.) Such evidence was produced by appellant's expert, and thus became a factual matter to be resolved by the jury. They were aided in this regard by the following pertinent language of CALJIC No. 12.61 (1982 rev.): "If the evidence establishes beyond a reasonable doubt that at the time of the chemical analysis of the defendant's blood, breath or urine there was 0.10 percent or more by weight of alcohol in the defendant's blood, you should find that the defendant was under the influence of an alcoholic beverage at the time of the alleged offense, *unless from all the evidence you have a reasonable doubt that the defendant was under the influence of an intoxicating beverage at the time of the alleged offense.*" (Italics added.)

## II. *Admission of Appellant's Statements Without Miranda Advisement*

■ Appellant here contends that it was error to allow his statements at the scene of the accident into evidence because there was no *Miranda* advisement. No one had indicated to Officer Sanchez that appellant appeared to be under the influence of alcohol before she approached the ambulance in which he was seated. On her initial approach, Officer Sanchez stated, "Hello. Were you involved in the accident?" to which appellant responded, "Yes, I was the driver." He then spontaneously blurted out that he thought he had killed his wife; that he had called for her, called her name and did not hear her cry out, nor hear any movement. He stated, "I think I killed my wife." Officer Sanchez then asked him how the accident occurred, and appellant stated, "something to the effect that he blacked out—he remembered going 55 miles an hour, and the next thing he knew he blacked out and he was over the side, and he was down there for an unknown period of time. [¶] He managed to crawl back up the canyon area and flag down a motorist for assistance to get some other people out there to give the other people with him in the car a hand." (*Ibid.*) This part of the conversation took place after Officer Sanchez smelled the odor of alcohol and saw the condition of appellant's eyes. She then asked him to step from the ambulance to perform the field sobriety test. He was never advised of his *Miranda* rights.

Appellant complains that at the completion of the hearing pursuant to Evidence Code section 402 subdivision (b), regarding the admissibility of this evidence, "[w]ithout any questioning of the witness by the prosecutor and without hearing any argument by either counsel, the trial court launched into its ruling concerning the officer's right to make a preliminary investigation of the accident and ruled, without distinguishing among the several

statements made, that 'the Court will permit the statements of the defendant in.'" Appellant did not complain of this procedure at that time. Counsel's reply to the court's observations was "Thank you, Your Honor."

Appellant was placed under arrest after he failed the field sobriety tests.

■ As appellant correctly points out, *Miranda* warnings must be given whenever the suspect is interrogated by law enforcement officials while in custody, which occurs if the suspect is physically deprived of his freedom of action in any significant way, or is led reasonably to believe that he is so deprived. (*People* v. *Herdan* (1974) 42 Cal.App.3d 300 [116 Cal.Rptr. 641]; *People* v. *Arnold* (1967) 66 Cal.2d 438 [58 Cal.Rptr. 115, 426 P.2d 515]; *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) Custody is an objective condition not exclusively dependent upon the intent of the interrogator to arrest the suspect, but rather dependent upon such factors as: (1) the site of the interrogation; (2) whether the investigation has focused on the suspect; (3) whether the objective indicia of arrest are present; and (4) the length and form of questioning. (*People* v. *Herdan, supra,* at p. 307.) ■ General on-the-scene questioning may take place of persons temporarily detained by officers who do not have probable cause to arrest. Questioning under these circumstances is designed to bring out the person's explanation or lack of explanation of the circumstances which aroused the suspicion of the police, and thus enable the police to quickly ascertain whether such person should be permitted to go about his business or held to answer charges. (*Lockridge* v. *Superior Court* (1969) 275 Cal.App.2d 612, 620 [80 Cal.Rptr. 223]; *People* v. *Manis* (1969) 268 Cal.App.2d 653, 669 [74 Cal.Rptr. 423].) This allowance may conceivably bring into play a very precarious balance and sensitivity of the mandates of the Fifth Amendment of the United States Constitution and compliance with *Miranda*. The shift from investigatory to accusatory questioning can be very subtle, and the dictates of the Fifth Amendment skillfully circumvented in the hands of those who lack appreciation for those dictates.

■ This problem, however, is not present in the instant case. Prior to her first question to appellant, Officer Sanchez had no indication that criminality was involved in the accident. There can therefore be no reasonable inference of surreptitious intent on her part. Pursuant to her duties, she had an obligation to get all of the information possible surrounding the causes of the accident. Further, appellant's statement that he thought he had killed his wife was not made in response to a question. Though the balance of appellant's statements were in response to Officer Sanchez' questioning as to how the accident had occurred, suspicion of criminality had not focused

on appellant at the time those questions were asked. Appellant was not in police custody at that time, but was seated in an ambulance. Appellant's observation that he was not free to leave the scene is interesting. There is no evidence to support the argument that he was not free to leave the scene because of police posture. He may well have been unable physically to leave the scene, but not by virtue of police conduct. The site of the interrogation was not one chosen by the police. Though it may have been a remote mountain setting under conditions traumatic to appellant, there is no reasonable inference that the police capitalized upon it to promote coercion. The interrogation was therefore investigatory, and appellant's statements admissible.

III. *Opinion Evidence of Theodosia as to What Appellant Was Drinking*

■ Appellant contends that it was error to allow Theodosia to testify that her father was drinking "Tequila Sunrises." He bases this objection on the provisions of Evidence Code section 800 which provides: "If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony."

It is contended that the testimony of Theodosia regarding what the label on the cans said was hearsay. However, he cites no authority for this proposition. Respondent contends that it was patently not hearsay, but cites no authority for its position, save Evidence Code section 702, which is of no assistance on that issue. The cases cited by appellant in support of his contention are of no assistance, because they apply to marijuana and hashish cases wherein the witness states a bare conclusion as to the nature of the substance. Here, in addition to the label on the can, Theodosia testified that appellant told her that he was drinking tequila sunrises. That admission by appellant was sufficient foundation for Theodosia's conclusion as to what appellant was drinking, and hence admissible.

IV. *CALJIC No. 12.61 (1982 rev.)*

■ Appellant contends that the giving of this instruction[1] was error. The accident took place on December 29, 1981. Appellant's trial was on November 16, 1982.

---

[1]CALJIC No. 12.61 (1982 rev.) provided in relevant part, at the time of trial on November 16, 1982, as follows: "If the evidence establishes beyond a reasonable doubt that at the time of the chemical analysis of the defendant's blood, breath or urine there was 0.10 percent or more by weight of alcohol in the defendant's blood, you should find that the defendant was under the influence of an alcoholic beverage at the time of the alleged offense, unless from all of the evidence you have a reasonable doubt that the defendant was under the influence of an intoxicating beverage at the time of the alleged offense."

At the time of the accident, Vehicle Code section 23126 was in effect, mandating a presumption that a person was driving under the influence of alcohol if the blood alcohol level was .10 or greater. That statute was repealed as of January 1, 1982. (Stats. 1981, ch. 940, p. 3570; *People* v. *Andrade* (1983) 141 Cal.App.3d Supp. 36 [190 Cal.Rptr. 738].) Certain flaws were detected in this statute, including the lack of the statutory presumption in reference to .10 percent or more blood alcohol level, and emergency legislation was enacted reinstating that presumption, and it became chapter 53 of the Statutes of 1982. (*Ibid.*) By virtue of this enactment, Vehicle Code section 23126, which was the presumption in effect at the time of the accident in this case, was renumbered as Vehicle Code section 23155. It was under this authority that CALJIC No. 12.61 (1982 rev.) was drafted and given in this case.

Appellant contends that the giving of an instruction pursuant to a 1982 statute, when the accident occurred in 1981, amounted to an ex post facto application. Ex post facto laws are prohibited. (Cal. Const., art. I, § 9.) For a law to be ex post facto " 'it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it.' " (*People* v. *Smith* (1983) 34 Cal.3d 251, 259 [193 Cal.Rptr. 692, 667 P.2d 149]; *Weaver* v. *Graham* (1981) 450 U.S. 24, 29 [67 L.Ed.2d 17, 23, 101 S.Ct. 960].) Though changes which are designated as procedural are not in themselves the true test, they do not as a rule come within the ex post facto doctrine. (*People* v. *Smith, supra,* 34 Cal.3d 251; *People* v. *Ward* (1958) 50 Cal.2d 702, 707 [328 P.2d 777, 76 A.L.R.2d 911], disapproved on other grounds in *People* v. *Morse* (1964) 60 Cal.2d 631, 637, fn. 2 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].) In the instant case, appellant was not disadvantaged because virtually the same presumption in effect at the time of trial was in effect at the time of the offense. The hiatus of one month and eighteen days in which there was no presumption took place after the accident in this case. For that reason alone, the application of the laws and resultant jury instruction were not ex post facto.

█ Appellant's next assignment of error in the giving of CALJIC No. 12.61 (1982 rev.) is that since the instruction told the jury that they "should find" the defendant guilty of count I, an impermissible presumption was placed upon them.

Appellant's position relies in large part on the holding in *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450]. The basic distinction between *Sandstrom* and the instant case is that in *Sandstrom* the court found that a reasonable jury could well have interpreted the presumption involved in that instruction as " 'conclusive,' that is, not technically as a presumption at all, but rather as an irrebuttable direction by the court to

find intent once convinced of the facts triggering the presumption. Alternatively, the jury may have interpreted the instruction as a direction to find intent upon proof of the defendant's voluntary actions . . . unless *the defendant* proved the contrary by some quantum of proof . . . thus effectively shifting the burden of persuasion on the element of intent." (*Id.,* at p. 517 [61 L.Ed.2d at pp. 46-47].) *Sandstrom* is not of ultimate assistance in this case because of the additional mitigating language in CALJIC No. 12.61 (1982 rev.) "unless from all of the evidence you have a reasonable doubt that the defendant was under the influence of an intoxicating beverage at the time of the alleged offense."

That, however, does not dispose of the problem. The courts have repeatedly grappled with the problems raised by the use of presumptions in criminal cases for at least the past two decades. (*People* v. *Roder* (1983) 33 Cal.3d 491 [189 Cal.Rptr. 501, 658 P.2d 1302]; *Ulster County Court* v. *Allen* (1979) 442 U.S. 140 [60 L.Ed.2d 777, 99 S.Ct. 2213]; *Barnes* v. *United States* (1973) 412 U.S. 837 [37 L.Ed.2d 380, 93 S.Ct. 2357]; *Turner* v. *United States* (1970) 396 U.S. 398 [24 L.Ed.2d 610, 90 S.Ct. 642]; *Leary* v. *United States* (1969) 395 U.S. 6 [23 L.Ed.2d 57, 89 S.Ct. 1532]; *United States* v. *Romano* (1965) 382 U.S. 136 [15 L.Ed.2d 210, 86 S.Ct. 279]; *United States* v. *Gainey* (1965) 380 U.S. 63 [13 L.Ed.2d 658, 85 S.Ct. 754]; *Tot* v. *United States* (1943) 319 U.S. 463 [87 L.Ed. 1519, 63 S.Ct. 1241].) The "saving language" of CALJIC No. 12.61 (1982 rev.), cited in the above paragraph, was present in *Roder, supra,* which invalidated a mandatory presumption in a jury instruction given for receiving stolen property in violation of Penal Code section 496. ■ The California Supreme Court in *Roder* states that a sharp distinction is drawn between a *permissive* presumption and a *mandatory* presumption. A permissive presumption allows—but does not require—the trier of fact to infer the ultimate fact from proof by the prosecutor of the "basic" fact, and places no burden of any kind on defendant. A *mandatory* presumption tells the trier of fact that it *must* find the "elemental fact" upon proof of the "basic fact" unless the defendant comes forward with some evidence to rebut the presumed connection between the two facts. (*People* v. *Roder, supra,* 33 Cal.3d 491, 497-498.)

The permissive inference is less problematical because it leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof to the defendant. It affects the application of the "beyond-a-reasonable-doubt" standard only if there is no rational way the trier of fact could make the connection permitted by the inference.

However the mandatory presumption is more troublesome because it tells the trier of fact that it *must* assume the existence of the ultimate elemental

fact from proof of specific designated basic facts, and limits the jury's freedom independently to assess all of the prosecution evidence in order to determine whether the facts of the particular case establish guilt beyond a reasonable doubt. (*Id.,* at p. 498.) It has been stated, in reference to the mandatory presumption, that " 'since the prosecution bears the burden of establishing guilt, it may not rest its case on [such] a presumption unless the fact proved is sufficient to support the inference of guilt beyond a reasonable doubt.' " (*Id.,* at p. 498; *Ulster County Court* v. *Allen, supra,* 442 U.S. at p. 167 [60 L.Ed.2d at p. 798].) However, the same authority holds that since a mandatory presumption limits the jury's freedom independently to assess all of the prosecution's evidence in order to determine whether the facts of a particular case establish guilt beyond a reasonable doubt, a mandatory presumption must be judged "on its face," not "as applied." (*Id.,* at pp. 157-160 [60 L.Ed.2d at pp. 792-794].) The obvious dilemma is that if the mandatory presumption must be judged on its face, and not as applied, one would never get to the test of whether the fact proved is sufficient by itself to support the inference of guilt beyond a reasonable doubt. To resolve this problem, we believe the dilemma should be resolved in favor of the basic cornerstone of our criminal law which places the burden of proof beyond a reasonable doubt squarely upon the prosecution.

■ The People contend that the instruction was permissive because it included the phrase "unless from all the evidence you have a reasonable doubt that the defendant was under the influence" (CALJIC No. 12.61 (1982 rev.), and that from this language it is clear that the jury is not bound by the presumption and that the prosecution has the burden of proof of all elements. It is true that the jury could interpret that language as allowing them to find that all of the evidence produced by the prosecution did not satisfy the burden of proof even in view of the presumption. But the constitutional fatality of the language is that it also allows the jurors to look to the defendant to rebut the presumption *beyond a reasonable doubt.* A presumption may not place upon a criminal defendant the burden of proving the nonexistence of the presumed fact by raising a reasonable doubt as to its existence. Under our system of justice, a defendant is presumed innocent until proven guilty. The prosecution must exclude any reasonable doubt as to his innocence; the defendant has absolutely no burden to produce any evidence. The defendant may literally "sit on his hands" and put the prosecution to its proof. (*Coffin* v. *United States* (1895) 156 U.S. 432 [39 L.Ed. 481, 15 S.Ct. 394]; *United States* v. *Gainey, supra,* 380 U.S. 63.) Justice Jefferson, in volume 2 of his California Evidence Benchbook (2d ed. 1982) section 46.4, pages 1714-1715, summarized the law as follows: "The beyond-a-reasonable-doubt concept that is mandated to be applied to presumptions in criminal cases by *Ulster County Court* v. *Allen, supra,* would seem

to render Evid C § 607,[2] as literally read, a violation of due process of law . . . whenever proof of an element of the offense depends on the use of a presumption. In such a case, the inference from the basic facts to the presumed fact must follow *beyond a reasonable doubt.* This necessarily casts the burden of proof of such facts beyond a reasonable doubt upon the prosecution. To place the *burden* on the defendant to *raise* a reasonable doubt would thus violate the *Ulster County Court* mandate." (Italics in original; see also *People* v. *Burres* (1980) 101 Cal.App.3d 341, 352-353, fn. 3 [161 Cal.Rptr. 593].)

Further, we note the concern expressed by the CALJIC Committee in the use note for CALJIC No. 12.61.1 (1983 rev.): "No appellate court has (at press time) determined whether or not the creation of a presumption by the amendment of Vehicle Code §§ 23152 and 23153 is constitutional. On the question of whether the trial court in using CALJIC 12.61.1 should use the phrase 'should find' or 'may but are not required to infer,' see *People* v. *Roder,* 33 Cal.3d 491. . . . The Committee believes that *People* v. *Roder* requires that the statutory presumption should be treated as a permissible inference in which event the first and third bracketed phrase should be stricken."

We agree. Granted, the word "should" does not have the same mandatory message as the word "shall," it is nonetheless a mandatory word which requires the presumption of the elemental fact from proof of the basic fact. In *Roder, supra,* the Attorney General contended that the word "should" be used rather than the term "are permitted, but not required." The court's reply was: "In our view, the use of the word 'should' in this context could easily be interpreted by a reasonable juror to transform the instruction from a permissive guideline into a mandatory directive, reintroducing the same constitutional problems posed by the current mandatory presumption." (*People* v. *Roder, supra,* 33 Cal.3d 491, 506, fn. 15.) Hence, the giving of the instruction as worded was error.[3]

The question still remains as to whether the error was prejudicial per se, or subject to the harmless-beyond-a-reasonable-doubt standard of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. The majority view is that the *Chapman* standard applies. (*People* v. *Roder, supra,* 33 Cal.3d 491, 504.) We hold that the error was

---

[2]Evidence Code section 607 provides: "When a presumption affecting the burden of proof operates in a criminal action to establish presumptively any fact that is essential to the defendant's guilt, the presumption operates only if the facts that give rise to the presumption have been found or otherwise established beyond a reasonable doubt, and, in such case, the defendant need only raise a reasonable doubt as to the existence of the presumed fact."

[3]The only case cited by the People on this point was ordered depublished.

harmless beyond a reasonable doubt. There were no questions by the jury indicating their confusion. The defendant's statements, as well as the testimony of Theodosia, established the defendant's driving. The observations of Officer Sanchez as to the defendant's objective symptoms, including the odor of alcohol and the failure of the field sobriety tests, as well as the testimony of Theodosia as to the defendant's drinking pattern, placed him squarely under the influence of alcohol for the purpose of driving a motor vehicle. This is augmented by the testimony of Marianne Bette, a physician who encountered defendant wandering down the road after the accident and concluded that the defendant was not sober, notwithstanding the effect of his recent trauma. The error was therefore harmless beyond a reasonable doubt.

### V. *Vehicular Manslaughter Instructions*

■ Appellant contends that the trial court erred in giving CALJIC No. 8.90 (1979 rev.) on the ground that this instruction informed the jury that appellant was charged with vehicular manslaughter in violation of Penal Code section 192 generally, though the information charged appellant specifically with a violation of section "192.3a" Penal Code in counts II and III. The contention was that this was error because appellant was not charged with vehicle manslaughter in general, but was charged with felony vehicle manslaughter, a killing with gross negligence. A collateral assignment of error is that the jury was instructed that an unlawful killing included "an act inherently dangerous to human life or safety, amounting to a misdemeanor or an infraction, as will be later defined," but that the jury was never advised thereafter as to what acts may have been considered "inherently dangerous to human life or safety," nor of the meaning of "a misdemeanor or an infraction." The People concede that there was no followup instruction in reference to the provision "as will be later defined." Appellant contends that the end result of this error is that it "infected the jury's directive as to finding or not finding gross negligence. . . ."

The jury found that there was no gross negligence, thus finding appellant guilty of misdemeanors rather than felonies as to counts II and III. The error was therefore harmless beyond a reasonable doubt.

### VI. *Lack of Instruction on the Basic Speed Law*

■ Appellant contends that the court should have instructed the jury on the basic speed law since it was argued by the prosecution to the jury as an underlying basis for the manslaughter conviction. It is obvious that appellant's speed was discussed only in the context of gross negligence. Neither side suggested that a speeding violation could be the unlawful "act

inherently dangerous to human life or safety, amounting to a misdemeanor or infraction,'' which would itself be the basis for a finding of vehicular manslaughter. It was not alleged that appellant violated the basic speed law. The instruction was therefore not required.

VII. *Jury Instruction that Appellant Should Be Presumed to Be Aware of the Risk Involved on the Issue of Gross Negligence*

■ The court gave an instruction, which it hand-marked "892.1" which provided as follows: "In order to determine if the defendant acted with gross negligence, you must objectively determine if a reasonable person in defendant's position would have been aware of the risk involved. If so, then the defendant is presumed to have had such awareness." The instruction was submitted by the prosecution, and taken from dicta in *People v. Watson* (1981) 30 Cal.3d 290, 296 [179 Cal.Rptr. 43, 637 P.2d 279]. The error, if any, was harmless beyond a reasonable doubt in view of the jury's finding that there was no gross negligence.

VIII. *Penal Code Section 654 Error*

■ Appellant's final contention is the sentence punishing him consecutively for counts I and II was in violation of Penal Code section 654.[4] This point is well taken. The People's reliance on *In re Hayes* (1969) 70 Cal.2d 604 [75 Cal.Rptr. 790, 451 P.2d 430], is inapposite. The court there held that the section 654 prohibition did not lie where the defendant was sentenced separately for driving under the influence of alcohol and driving on a suspended license. The problem created in this case is answered in *People v. Young* (1964) 224 Cal.App.2d 420 [36 Cal.Rptr. 672], and *People v. Rocha* (1978) 80 Cal.App.3d 972 [146 Cal.Rptr. 81]. Where there is a finding of guilt for both a violation of section 23101 of the Vehicle Code and for vehicular manslaughter in violation of section 192, subdivision 3 of the Penal Code, the application of Penal Code section 654 is invoked. In such a case, the appropriate remedial procedure is to permit the sentence on the greater or more serious offense to stand and to stay execution of the lesser. (*People v. Niles* (1964) 227 Cal.App.2d 749, 755-756 [39 Cal.Rptr. 11]; *People v. Rocha, supra,* 80 Cal.App.3d 972, 977.)

Since counts II and III were misdemeanors, the more serious punishment was that imposed in count I. The People's reliance on *People v. Eagles*

---

[4]Penal Code section 654 provides as follows: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other."

(1982) 133 Cal.App.3d 330 [183 Cal.Rptr. 784], is misplaced. Though the court there held that multiple punishment can be imposed where there are multiple victims in vehicular manslaughter charges, there was no charge in that case of driving under the influence of alcohol as there is in the instant case.

## Disposition

Consequently, the judgment is modified to stay execution of sentence imposed on counts II and III, such stay to become permanent when appellant has completed serving the sentence imposed on count I. In all other respects the judgment is affirmed.

Johnson, Acting P. J., and Thompson, J., concurred.

The petitions of both parties for a hearing by the Supreme Court were denied November 15, 1984.