Filed 2/20/15  P. v. Villaneda CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040183 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. F1346011) |
| v. | |
| DAVID VILLANEDA, | |
| Defendant and Appellant. | |

Defendant David Villaneda was convicted by jury trial of attempted first degree burglary (Pen. Code, §§ 459, 460, subd. (a), 664).[1]  He was sentenced to a total term of 11 years in prison.  On appeal, he argues the trial court erred in admitting the statements he made to a police officer following a parole search of his apartment, because he was in custody during the interrogation and the officer failed to advise him of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  He argues the officer's omission requires reversal of his conviction, because the error was prejudicial.

For the reasons set forth below, we conclude the challenged statements were admitted in error, and the admission of the statements was not harmless beyond a reasonable doubt.  Accordingly, we reverse the judgment.

---

[1] Further unspecified statutory references are to the Penal Code.

FACTUAL AND PROCEDURAL BACKGROUND

*The Offense*

On March 6, 2013, at around 2:30 a.m., Sonia Hart was at home with her husband, James.[2] The Harts' home was attached to the couple's mini-storage business. Sonia was in the bedroom with the lights off, playing with her iPhone. James was asleep. The porch light was on, and it was rainy and windy outside. Sonia saw a shadow go by in her backyard. Initially, she thought it was just the wind. However, she heard the sliding glass door start to open. Sonia elbowed James and told him someone was coming into their house. She saw the curtain move, and her dog lunged from the end of the bed. Sonia later told a police officer that she saw a figure of a man standing in the doorway wearing dark clothes with blond hair. The figure stood in the doorway for only a few seconds.

James ran outside after taking off his sleep apnea machine, and Sonia called 911. James went over the fence to see if he could identify or stop the individual. He did not see anyone outside but found a cell phone on the ground. James picked up the phone and yelled, "Got your phone."

Morgan Hill Police Officer Jeff Brandon was dispatched to the Harts' residence following the incident. James gave Brandon the phone he had found outside. The phone was working, and Brandon searched it and saw it contained photographs of an individual later determined to be defendant. Nothing was taken from the Harts' home, and Brandon did not visually see footprints or fingerprints inside the residence. Brandon traced the phone and ascertained it belonged to defendant.

That same night, Officer Brandon and three other officers went to defendant's apartment, located approximately two blocks from the Harts' residence. All four officers

___

[2] Since Sonia and her husband, James, share the same last name, we refer to them by their first names for clarity. No disrespect is intended.

were in uniform and armed with firearms. However, they did not display or brandish their weapons during their encounter with defendant. Brandon observed wet footprints just outside the door to the apartment. The lights were on, but when Brandon knocked someone turned the lights off. Brandon announced he was there for a parole search. Eventually, defendant opened the door. Defendant confirmed he was on parole, and Brandon proceeded to search defendant's bedroom. Defendant was told to sit down in the living room. Brandon found wet clothes in defendant's bedroom, including a black sweatshirt or jacket, a black shirt, a white beanie cap, and a pair of gray sweatpants.

Officer Brandon returned to the living room and asked defendant several questions to determine whether he was the individual who had been at the Harts' residence. Another officer remained in defendant's bedroom. It was unclear whether another one of the officers stood at the apartment's doorway during the questioning, or if this officer went in and out of the room. Brandon recorded the interview using a personal recording device. Defendant was not handcuffed but was told to sit down. The questioning lasted several minutes. Brandon had a flashlight under his arm, which he typically used when taking notes. At certain points, the light was shined on defendant's face. However, defendant did not flinch or react to the presence of the light. Brandon said he had used the flashlight to take notes on his notepad and to help illuminate the video recording of the encounter. There was another individual in the apartment along with defendant, but this individual was not in the living room while defendant was being questioned.

Defendant told Officer Brandon he had been drinking that night and was not completely sure about what he had done earlier that evening. Brandon did not think defendant was under the influence, and he did not smell alcohol on defendant.

Officer Brandon asked defendant about his whereabouts that night. Defendant told him that he had gone to a Safeway grocery store to get some snacks. There was a Safeway store close to defendant's apartment that had an exit that went up to the street to where the Harts lived. Brandon asked him if he had lost anything. Initially, defendant

3

said he might have lost a lighter, but he was not sure. Later, he said he had lost his cell phone.

Officer Brandon asked defendant if he had opened the sliding door at the Harts' home. Brandon also indicated that defendant had been caught on video surveillance at the Harts' home.[3] Defendant responded that he had gone to ask someone for cigarettes. However, he left when he heard a woman's voice, because he did not want to scare anybody. Defendant did not expressly confirm he had opened the sliding glass door at the Harts' house.

Officer Brandon placed defendant under arrest. Defendant had not been given a *Miranda* warning prior to the questioning.

*Procedural History*

On July 1, 2013, the trial court conducted a pretrial hearing to determine whether the statements made by defendant to Officer Brandon should not have been admitted under *Miranda*.

The People argued that a *Miranda* advisement was not necessary, because defendant was not in custody at the time of the interrogation. Defense counsel countered that defendant was in custody at the time of the questioning based on several factors including: Officer Brandon had testified that defendant was not free to leave during the questioning, there were three or four officers in the residence, the officers were in full uniform, and a flashlight was shined on defendant's face. Therefore, defense counsel maintained the interrogation was custodial and a *Miranda* warning was required.

After considering the parties' arguments, the trial court first concluded Officer Brandon had conducted an interrogation. On the issue of whether defendant was in custody at the time of the questioning, the court considered various factors. The court noted that defendant was encountered in his home, where he was asked to sit on his own

---

[3] Later, Officer Brandon testified that there was no surveillance video.

4

living room sofa. Furthermore, there was no formal arrest, defendant was not in handcuffs, the officers did not display any weapons, and defendant was not told he was not free to leave. There were two or maybe three officers in the room at the time of the interrogation. However, another resident of the apartment was "freely roaming" the residence during the interrogation. Brandon's demeanor during the questioning, as seen on the tape of the encounter, was "respectful, nonconfrontational, not harsh or overly accusatory," and was "fairly mild." The trial court noted that Brandon had used a flashlight during the interrogation but accepted that it was needed to illuminate the video, which was dimly lit. Defendant did not react to the flashlight by blinking or squinting in a discernible way. The parole search, which lasted approximately two or three minutes, was relatively brief and no contraband was discovered. The court thereafter concluded that defendant was not in custody and admitted the statements he made to Brandon.

On July 2, 2013, the district attorney filed an amended information charging defendant with a count of first degree burglary of an inhabited dwelling (§§ 459, 460, subd. (a)) and a count of attempted first degree burglary of an inhabited dwelling (§§ 459, 460, subd. (a), 664). It was further alleged that the first count was a violent offense (§ 667.5, subd. (c)(21)), that defendant had a prior serious felony conviction (§ 667, subd. (a)), that he had served two prior prison terms (§ 667.5, subd. (b)), and that he had one prior strike conviction (§§ 667, subds. (b)-(i), 1170.12). Defendant pleaded not guilty and waived a jury trial on his prior offenses.

The case went to trial before the jury, and the jury returned a verdict on July 11, 2013, finding defendant not guilty of first degree burglary of an inhabited dwelling but guilty of attempted first degree burglary of an inhabited dwelling.

On September 9, 2013, the trial court found true the serious prior felony conviction allegation, the two prison priors, and the strike prior. The trial court also

denied defendant's *Romero* motion.[4]  Defendant was sentenced to a total term of 11 years in prison, comprised of four years for the attempted burglary conviction, five years for his serious prior felony conviction, and two years for his two prison priors.  Defendant appealed.

## DISCUSSION

The sole issue on appeal is whether the trial court erred in admitting defendant's statements to Officer Brandon following the pretrial *Miranda* hearing.  Defendant maintains reversal is required, because he was in custody at the time of the interrogation, and the error was not harmless beyond a reasonable doubt.

*Admission of Defendant's Statements to Officer Brandon*

The Supreme Court in *Miranda* held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (*Miranda*, *supra*, 384 U.S. at p. 444.)  " 'Thus two requirements must be met before *Miranda* is applicable; the suspect must be in "custody," and the questioning must meet the legal definition of "interrogation." ' " (*People v. Whitfield* (1996) 46 Cal.App.4th 947, 953.)

"Interrogation consists of express questioning or of words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1224.)  Whether defendant was interrogated is not at issue here; both parties agree an interrogation took place.  The contested issue involves the second element of custody.  An individual is in custody for the purposes of *Miranda* if he is "deprived of his freedom in any significant way or is led to believe, as a reasonable person, that he is so deprived." (*People v. Taylor* (1986) 178 Cal.App.3d 217, 225.)

---

[4] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

Determining whether a defendant is in custody is based on the "objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." (*Stansbury v. California* (1994) 511 U.S. 318, 323.) " '[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances.' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1167.) A person is in custody if he or she feels they cannot end the interrogation and leave. (*Howes v. Fields* (2012) __ U.S. __ , __ [2012 U.S. Lexis 1077] [132 S.Ct. 1181, 1189-1190].)

*People v. Aguilera* (1996) 51 Cal.App.4th 1151, set forth some of the circumstances relevant to determining whether a defendant was in custody for the purposes of *Miranda*. "Among them are whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation." (*Id*. at p. 1162.) "No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*Ibid*.)

7

"An interrogation conducted within the suspect's home is not *per se* custodial. [Citation.] On the contrary, courts have generally been much less likely to find that an interrogation in the suspect's home was custodial in nature. [Citations.] The element of compulsion that concerned the Court in *Miranda* is less likely to be present where the suspect is in familiar surroundings. [Citation.] Nevertheless, an interrogation in the suspect's home may be found to be custodial under certain circumstances." (*U.S. v. Craighead* (9th Cir. 2008) 539 F.3d 1073, 1083.) In *Craighead*, the Ninth Circuit concluded the defendant was in custody where eight visibly armed officers entered his home to execute a search warrant and interviewed the defendant in a back storage room with the door closed and guarded by an armed officer. (*Id*. at pp. 1084-1089.)

" 'Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact. [Citation.] When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must "apply a deferential substantial evidence standard" [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, "a reasonable person in [the] defendant's position would have felt free to end the questioning and leave." ' " (*People v. Moore* (2011) 51 Cal.4th 386, 395.)

The parties dispute whether defendant was in custody at the time of the questioning.[5] As articulated above, there are many circumstances that a court may consider in determining whether an individual is in custody. (*People v. Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) Here there are multiple factors present that indicate the interrogation was not custodial. The interrogation did not occur within the coercive confines of the police station but within the confines of the defendant's home. The

---

[5] As explained before, the parties do not dispute that defendant was interrogated for the purposes of *Miranda*.

officers did not display or brandish weapons, and Officer Brandon's tone when questioning defendant was mild. The parole search and interrogation only lasted a few minutes.

However, there are also multiple factors present that indicate the interrogation was in fact custodial. Four officers arrived at defendant's home to conduct the parole search, with approximately three to four officers present inside defendant's residence. One officer remained in defendant's bedroom during the search, while another may have been standing in the apartment doorway. During the questioning, one officer remained in defendant's bedroom. Although defendant was not told he could not leave, he was also not told he was free to end the interrogation.

Additionally, the officers announced to defendant upon their arrival that they were there for a parole search. Defendant argues that *People v. Farris* (1981) 120 Cal.App.3d 51 (*Farris*) is analogous. In *Farris*, Farris was on parole following a burglary conviction. An officer suspected Farris of being involved in a nighttime burglary in which jewelry had been taken. The officer, Farris' parole agent, and another parole agent went to defendant's home where they told him he was a suspect and that they were going to search his bedroom. (*Id*. at p. 54.) The officers found jewelry that resembled the items taken during the burglary and asked Farris who owned the jewelry. Farris responded that the jewelry belonged to him, and he had obtained the jewelry from a jewelry store. (*Ibid*.) Farris was not given any *Miranda* warnings before the officers began questioning him at his home.

The *Farris* court noted that for the purposes of *Miranda*, a person is in custody if a reasonable person is led to believe his movement has been restricted. (*Farris*, *supra*, 120 Cal.App.3d at p. 56.) As a parolee, Farris had consented to the search of his residence and of his person, and his parole officer could detain him at any time. (*Ibid*.) Therefore, the court concluded that it "goes without saying" that "[Farris] was not free to leave while his bedroom was being searched. Had that search proved fruitless, he himself was

9

a potential subject for search. He knew that. From the time that [the officers] arrived, defendant was obviously deprived of his freedom in a significant way." (*Ibid*.) The court thereafter reversed the judgment after concluding the statements should not have been admitted, and the admission was prejudicial. (*Id*. at p. 58.)

The *Farris* court acknowledged that other appellate courts had held that *Miranda* warnings are not required each time a parole officer interviews a parolee. For example in *In re Richard T*. (1978) 79 Cal.App.3d 382, the appellate court concluded that no *Miranda* warning was required, because the parole officer was investigating a violation of a parole condition that was not a crime and only later discovered a crime. However, the *Farris* court distinguished *Richard T*. Unlike *Richard T*., in *Farris* the parole officer questioned Farris about a *new* criminal offense, with the investigation always focused on Farris. "Furthermore, once [Farris] was found to be in possession of the stolen jewelry, probable cause to arrest him existed." (*Farris*, *supra*, 120 Cal.App.3d at p. 57.)

Unlike *Farris*, defendant was not told at the outset of the questioning that he was a suspect in the burglary case. In defendant's case, without first alluding to his potential status as a suspect, Officer Brandon asked defendant about his whereabouts that night, a fairly neutral question. However, the questioning became more coercive and less neutral when Brandon asked defendant specifically if he had opened the Harts' sliding glass door. Brandon also told defendant that he had been caught on video at the Harts' home in order to elicit more information from him. Later, Brandon testified at the pretrial *Miranda* hearing that no such surveillance video existed. "Accusatory questioning is more likely to communicate to a reasonable person in the position of the suspect[] that he is not free to leave." (*People v*. *Lopez* (1985) 163 Cal.App.3d 602, 608, fn. 4.)

We agree that in certain respects *Farris* is analogous to the present case. Like the *Farris* defendant, defendant here was not free to simply leave during the parole search. And, like in *Farris*, defendant was not interviewed for a noncriminal violation of a parole condition but for an entirely new offense of burglary. Additionally, defendant knew the

10

nature of his parole status and was therefore aware that he could be detained at any time. (*Farris*, *supra*, 120 Cal.App.3d at p. 56.) He had reason to believe he could not leave while the search was underway and that he himself could be subjected to a search. (*Ibid*.)

However, even if we determined the officers' presence in defendant's home for the purposes of a parole search weighed in favor of a finding of custody, we must still determine whether under the *totality of the circumstances* a reasonable person in defendant's position would have understood that there were substantial grounds for an arrest, an arrest was imminent, and he was therefore not free to leave.[6] (See *U.S. v. Newton* (2nd Cir. 2004) 369 F.3d 659, 673.) The People concede that this issue is complicated, because there are multiple factors weighing for and against a finding of custody. We conclude that in our independent review of the circumstances of this case, defendant was effectively deprived of his ability to end the interrogation and leave. Therefore, he was in custody for the purposes of *Miranda*.

In coming to this conclusion, we acknowledge the People's argument that questions posed by an officer during an investigatory detention need not always require a *Miranda* warning. "General on-the-scene questioning may take place of persons temporarily detained by officers who do not have probable cause to arrest. Questioning under those circumstances is designed to bring out the person's explanation or lack of explanation of the circumstances which aroused the suspicion of the police, and thus enable the police to quickly ascertain whether such person should be permitted to go

---

[6] The People contend that Officer Brandon's testimony at the Evidence Code section 402 hearing that he would not have permitted defendant to leave is irrelevant, citing to *J.D.B. v. North Carolina* (2011) __ U.S. __, __ [131 S.Ct. 2394, 2402]. We agree. As stated in *J.D.B.*, "the 'subjective views harbored by either the interrogating officers or the person being questioned' are irrelevant." (*Ibid*.) As required, our inquiry here applies an *objective*, not a *subjective* test--whether a reasonable person would believe his or her movements were restricted. We conclude that regardless of Brandon's personal views, a reasonable person in defendant's position would have believed his or her movements were restricted based on the totality of the circumstances.

11

about his business or held to answer charges." (*People v. Milham* (1984) 159 Cal.App.3d 487, 500.)

We find that this general rule is not entirely applicable to determining whether a defendant is in *custody*; it is applicable to determining whether a defendant was subjected to an *interrogation*. (See *People v. Bejasa* (2012) 205 Cal.App.4th 26, 39-40.) It is true that defendant's status as a parolee did not automatically transform Officer Brandon's questions into an interrogation. However, whether defendant was interrogated is not at issue here. Both parties agree an interrogation occurred.

Furthermore, we disagree with the People's interpretation of *Farris* as failing to address the relevant question of whether the defendant had been placed under formal arrest or restrained to a degree associated with a formal arrest. The *Farris* court did not base its conclusion that the defendant was in custody solely on the fact that he had been detained. Rather, the *Farris* court determined that under the circumstances of the case, the defendant was in custody because his freedom was deprived in a significant way. (*Farris*, *supra*, 120 Cal.App.3d at p. 56.) This conclusion does not contravene the relevant standard we must employ in determining whether a defendant was in custody: whether " ' "a reasonable person in [the] defendant's position would have felt free to end the questioning and leave." ' " (*People v. Moore*, *supra*, 51 Cal.4th at p. 395.)

*Prejudice*

Next, we must examine whether the admission of the statements was prejudicial. "The erroneous admission of statements obtained in violation of *Miranda* is reviewed for prejudice pursuant to *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). [Citations.] Under *Chapman*, reversal is required unless the People establish that the court's error was 'harmless beyond a reasonable doubt.' " (*In re Z.A.* (2012) 207 Cal.App.4th 1401, 1422.) Our Supreme Court has interpreted this requirement to mean that "the appropriate inquiry is 'not whether, in a trial that occurred without the error, a guilty verdict would surely

12

have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.' " (*People v. Quartermain* (1997) 16 Cal.4th 600, 621.)

The People opine that even if the trial court erred in admitting the statements, the error was not prejudicial under the standard set forth under *Chapman*. The People claim there was ample evidence of defendant's guilt, such that even without the statements the jury would have convicted him of the same offense. We disagree.

The evidence cited by the People is at best circumstantial. Sonia Hart never stated she saw defendant, only that she saw a figure outside. Her husband, James, also did not see defendant when he ran out of the house to chase down the suspected intruder. Defendant's phone was found outside the Hart residence, but defendant lived close by and there was no evidence establishing when he dropped the phone. Although his clothes were wet, defendant initially explained he had recently walked to a nearby Safeway store to purchase snacks.

In contrast, defendant's statements to Officer Brandon that he had gone to the Harts' residence to ask someone for cigarettes placed him at the scene of the crime. Furthermore, admission of these statements cast wide suspicion on his explanation that the wet clothes found in his bedroom were the result of his trip to the Safeway store. The statements also corroborated the prosecution's theory that defendant dropped his phone outside the Harts' home during the attempted burglary.

Accordingly, we cannot conclude the erroneous admission of defendant's statements taken in violation of *Miranda* did not contribute to the guilty verdict. It is not harmless beyond a reasonable doubt, and we must therefore reverse the judgment.

### DISPOSITION

The judgment is reversed.

13

_____
Premo, J.

WE CONCUR:


_____
Rushing, P.J.



_____
Elia, J.