Filed 12/5/24  P. v. Madden CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAMAAL TYREE MADDEN,<br><br>    Defendant and Appellant. | B328978<br><br>(Los Angeles County<br>Super. Ct. No.<br>MA081588) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert G. Chu, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 2021, defendant and appellant Jamaal Tyree Madden took part in a street race that ended in a fatal car crash. A jury subsequently convicted defendant of two counts of second degree murder (Pen. Code, § 187, subd. (a); counts 1 & 2),[1] one count of hit and run driving resulting in death or serious injury (Veh. Code, § 20001, subd. (b)(2); count 3), and one count of driving a motor vehicle without a valid driver's license (Veh. Code, § 12500, subd. (a); count 5). Defendant was sentenced to a total of 30 years to life plus four years six months in state prison.

On appeal, defendant raises several arguments against the judgment: (1) the trial court erroneously admitted various pieces of evidence; (2) defendant's right to effective counsel was violated by his trial counsel's failure to object to prosecutorial misconduct; and (3) the cumulative effect of these errors prevented defendant from receiving a fair trial. Defendant also contends that the trial court erred by imposing (1) consecutive sentences on his two murder convictions and (2) maximum and consecutive sentences on the two determinate terms.

We agree that the trial court erroneously relied on unproved aggravation factors when selecting the upper terms of imprisonment for defendant's two determinate sentences (§ 1170, subd. (b)(2)), and reverse and remand for resentencing on that basis. In all other respects, the judgment is affirmed.

**FACTUAL AND PROCEDURAL BACKGROUND**

I.    *Prosecution's case-in-chief*

    A.    <u>The accident</u>

On the night of June 8, 2021, Spechelle P. (Spechelle) hired a car from a ridesharing service. Rideshare driver Lesther D.

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

(Lesther) picked Spechelle up from her home just before midnight.[2]

Approximately half an hour later, a black Dodge Challenger (the Challenger) crashed into Lesther's car, a Toyota Corolla (the Corolla). The collision caused the Corolla to slam into a pole and burst into flames. The driver of the Challenger fled the scene before emergency responders arrived. Spechelle and Lesther died at the scene.

### B. 911 calls

Multiple people called 911, reporting the accident, that "cars . . . were racing," and that one car had fled from the scene.

### C. Bystanders

At the time of the collision, Raymundo Torres (Torres) and Axel Ramirez (Ramirez) were eating in a restaurant when they saw flames outside. They immediately rushed to the scene and saw the crashed Challenger near the Corolla, which had caught on fire.

Torres and Ramirez found a man standing next to the Challenger, retrieving items from the front seat. They asked the man if he was alright, and he responded "I think so."

Less than one minute later, an Infiniti with a muffled muffler pulled up to the scene of the accident. The man ran from the Challenger and jumped into the passenger seat of the Infiniti. The Infiniti immediately fled the scene.

---

[2]    California Rules of Court, rule 8.90(b) requires appellate courts to "consider referring to" certain individuals "by first name and last initial" to protect their privacy. Accordingly, we refer to the victims in this case by their first names and last initials, and thereafter by first names only. No disrespect is intended.

3

Turning their attention to the growing fire spreading from the Corolla, Torres and Ramirez heard Lesther screaming in pain. They and other bystanders tried to help him, but the flames were too intense.

D.    <u>Emergency responders</u>

Lyle Koegler (Koegler), a fire captain at the Los Angeles Fire Department, responded to the collision scene.

Upon arriving, Koegler saw the Corolla engulfed in fire that was spreading to roadside vegetation. He also saw a body and a severed, charred arm lying in the street. After Koegler and his colleagues extinguished the fire, they discovered a second body burning in the bushes.

Koegler described the collision scene as "one of the worst ones [he] ha[d] seen" in his 25 years of firefighting experience.

E.    <u>Investigation</u>

1.    *The accident scene*

Detective Elizabeth Sherman, a traffic investigator with the Los Angeles County Sheriff's Department (LASD), arrived at the scene roughly two hours later. Based on her "the scene investigation, the area of impact . . . the damage to the vehicles, witness statements, as well as [her review of surveillance] video[s] [from nearby buildings,]", Detective Sherman concluded that "the driver of the Challenger was travel[l]ing at a high rate of speed, collided into the rear end of the Corolla which was driving significantly slower . . . . [¶] The first impact caused the Corolla to erupt into flames, caused it to be pushed into a light pole and eventually come to rest in the brush[.]"

2.    *The Challenger*

The driver's side airbag in the Challenger was bloodied in the crash; a DNA test revealed that the blood belonged to

4

defendant. Additionally, Detective Sherman found defendant's state identification card wedged between the dashboard and the windshield of the Challenger. Defendant did not have a valid driver's license.

The Challenger was registered to a car rental company. Approximately two weeks prior to the collision, the Challenger was rented by defendant's brother, Caleb Madden (Caleb).[3] Shortly thereafter, defendant got pulled over while driving it; he was given a verbal warning for speeding.

About six hours after the fatal crash, Caleb informed the rental company that the Challenger had been stolen. The rental company told him to file a police report, but Detective Sherman found that no law enforcement agency had ever been notified of the stolen car.

Detective Sherman ultimately concluded that defendant was the driver of the Challenger. He was arrested three weeks later.

### 3. *Defendant's postarrest statements*

Detective Sherman and another LASD detective, Detective Hall,[4] interviewed defendant shortly after his arrest. Defendant claimed that he had been in Las Vegas at the time of the accident. He also repeatedly asked the detectives how long a sentence he could expect if he was convicted.

Defendant admitted that driving fast and racing other cars was dangerous and could cause death. When pressed, he said

---

[3] Because defendant and his brother share the same last name, we refer to Caleb by his first name. No disrespect is intended.

[4] Detective Hall's first name does not appear in the record.

that it was dangerous to race on public roads because "[o]ther people['s] life besides your life is in your hands[.]"

  F.  <u>Other evidence admitted at trial</u>

    1.  *Prior traffic violations*

The prosecution introduced evidence of two prior traffic accidents involving defendant. In the first incident, which took place in October 2020, defendant rear-ended a car that was stopped to make a left turn (the 2020 accident).

A witness testified that shortly before the accident, he was driving at 55 or 60 miles per hour when defendant's car sped past, going "quite a bit" faster than him; he was scared because he "didn't know [the car] was there until it passed me." A few minutes later, he saw that the car had collided with another car.

The driver of the other car did not see defendant's car before the collision. About 15 or 20 minutes after the accident, defendant approached the driver of the other car, who was sitting by the side of his car waiting for paramedics to arrive.

The police officer who responded to the accident scene determined that defendant was likely driving faster than the speed limit, given the damage to both vehicles. Defendant proffered competing evidence from an accident reconstruction expert, who opined that defendant was not speeding at the time of the crash.

The second incident occurred two weeks before the crash, when defendant was pulled over for straddling between two lanes and speeding while driving the Challenger (the 2021 traffic stop). Defendant was driving approximately 20 miles over the posted speed on a city street. The officer gave defendant a verbal warning.

Defendant did not object to the admission of this evidence.[5]

  2. *Crime scene and autopsy photographs*

Throughout trial, the prosecution introduced a total of 17 photographs of the crime scene and the victims.[6] Defendant did not object to any of them.

The first group of photographs (the crime scene photos) included (1) one photograph of a body concealed by the roadside brush fire (Exh. 5); (2) one photograph showing both bodies at the scene after the fire was extinguished (Exh. 6); (3) one photograph of a severed, charred arm (Exh. 7); and (4) one photograph of the burned car, which also showed a portion of one of the victims' bodies (Exh. 41).

The second group (the autopsy photos) included (1) eight photographs of the thermal injuries on different parts of both victims' bodies (Exhs. 15A-B, 16, 20A-E); (2) three photographs of the blunt force injuries sustained by the victims (Exhs. 18, 21A-B); (3) one photograph showing where a victim had suffered

---

[5] Defendant's sole concern regarding the traffic stop for speeding was that the officer (1) performed "a compliance check" of the Challenger for a potential parole or probation violation, and (2) mentioned gangs. The trial court excluded any evidence of these issues, but allowed "the traffic stop and the reason for that stop . . . to come in."

[6] When the prosecution filed its trial brief, it advised that the prosecution would "seek to admit a limited number [of] autopsy photographs as well as collision scene photographs that include the deceased victims." Defendant did not file a written objection. Later, at a pretrial hearing, the trial court signaled that it was not going "to . . . exclude those types of photos." Defendant's trial counsel said that he would not object to those photographs being passed to the jury.

7

"traumatic amputation or separation of a portion of the arm" (Exh. 17); and (4) one photograph showing an accumulation of soot in one of the victims' windpipe (Exh. 19). The autopsy photos were all introduced during the coroner's testimony.

### 3. *Jail phone call*

On January 24, 2023, defendant called his family from jail (the phone call). Defendant and his mother strategized about the upcoming trial. His mother told him, "You gotta get smart. I told you, you walk in [the courtroom] looking remorseful." Defendant asked, "But you want me to walk in there crying?" His mother said, "You could cry if you need to . . . [¶] . . . you can cry if you want to." Defendant responded, "What am I gonna cry for? ****, I'm still alive! Cuz [*sic*], I don't give a **** if they give me a million years in prison, I'm still alive, ****."

The prosecution moved to introduce the phone call into evidence. Defendant objected, arguing that his statements during the call were irrelevant and prejudicial. The trial court overruled the objection, "finding th[e] [phone call] relevant and probative after a weighing process under [section] 352" of the Evidence Code.

At trial, defendant renewed his objection to the phone call. He contended that the phone call was minimally probative but "inflammatory[.]" The trial court again overruled the objection.

## II. *Defense*

### A. Dr. Haig Kojian

Dr. Kojian, a psychologist who had evaluated defendant, opined that defendant had attention deficit hyperactivity disorder and tested within the borderline for an intellectual disability diagnosis. Dr. Kojian felt that defendant was "lacking" in his

8

capacity to make decisions, have foresight, and assess consequences.

Dr. Kojian also opined that persons of defendant's age had not yet reached full neurological maturity.[7]

B.     Defendant's testimony

Defendant testified on his own behalf.  He admitted that he had been driving at 130 miles per hour the night of the accident while racing with a friend, but denied having any subjective awareness that someone could get injured or die as a result of his driving.  He conceded that he "kn[e]w [street racing was] dangerous, of course."

Defendant fled the scene of the accident because he "knew it was bad" and he "didn't want to go to jail."  He didn't call the authorities or report the accident, claiming that he "didn't know what the outcome" of the accident "was[,]" until he saw a warrant for his arrest on charges of murder.

Regarding the 2020 accident, defendant testified that he initially "had someone at the scene take [him] from that . . . scene and go someplace else[,]" but he "came back eventually" to "check and see if everyone was all right."  He volunteered that he "stayed" at that accident "[be]cause [he] kn[e]w . . . it wasn't a big deal."

Lastly, with respect to the phone call, defendant testified that he did not mean what he said; he "was just trying to protect [his] family" by "making them feel I'm all right."

III.   *Sentencing*

Following defendant's conviction, the matter proceeded to sentencing.  The trial court noted that "[a]s a result of

_____

[7]     Defendant was 18 years old at the time of the fatal car crash.

9

. . . defendant's callous disregard for the safety of others, and flagrant violations of the vehicle codes, two innocent human beings were killed[.]" Accordingly, his crimes "involved great violence, great bodily harm and other acts disclosing a high degree of cruelty, viciousness and callousness."

The trial court expressed concern that "defendant had repeatedly committed acts where it seems like he doesn't care about the consequences of his actions. [¶] He does not have a valid driver's license and yet he continues to drive. He ends up rear-ending another vehicle due to his driving. He's pulled over by law enforcement for driving at an unsafe speed. Then instead of learning his lesson, he's racing on city streets and ends up striking another car, causing that other car to be fully engulfed in flames."

And, "[i]nstead of stopping to help, . . . defendant gets his belongings out of the car and flees the scene in another car, which shows that the manner in which the crime was carried out indicates planning, sophistication, or professionalism . . . and, again, shows . . . defendant not caring about the consequences of his actions. [¶] He made no efforts to contact law enforcement on the night of the crash or any time before he was arrested."

The trial court noted that "the most shocking thing was . . . [defendant's] lack of remorse . . . throughout this trial. Throughout the trial, I saw him laughing. I saw him throwing up hand signs towards individuals in the audience numerous times as if the proceedings were a joke to him." Accordingly, the trial court found that "defendant would be a danger to others if not imprisoned."

The trial court acknowledged multiple factors in mitigation, including defendant's youth and mental health diagnoses.

However, the court found that "the circumstances in aggravation far outweigh any mitigation in this case." Accordingly, the trial court "[w]ithout hesitation this court will impose the maximum sentence allowable under the law."

IV.    *Appeal*

Defendant timely appealed.

## DISCUSSION

I.    *Alleged evidentiary error*

Defendant contends the trial court erred in admitting evidence of his two prior traffic violations; graphic photographs from the crime scene; and the phone call. To the degree any of his evidentiary objections was forfeited, defendant contends he received ineffective assistance of counsel.

A.    <u>General legal principles</u>

"No evidence is admissible except relevant evidence," and "[e]xcept as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, §§ 350, 351.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Although a trial court "'has broad discretion in determining the relevance of evidence . . . [, it] lacks discretion to admit irrelevant evidence.' [Citations.]" (*People v. Riggs* (2008) 44 Cal.4th 248, 289.)

The trial court also has discretion to exclude relevant evidence under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

When evidence is so extremely unfair that its admission violates the fundamental concepts of justice, due process is

11

implicated. (*Perry v. New Hampshire* (2012) 565 U.S. 228, 237.) "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions. Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.' [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose." (*Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918, 920, fn. omitted (*Jammal*); *People v. Hunt* (2011) 196 Cal.App.4th 811, 817 [approvingly quoting the *Jammal* language].)

B.     Standard of review

A trial court's evidentiary rulings are reviewed for an abuse of discretion. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

Typically, a ruling erroneously admitting evidence does not require reversal unless it is reasonably probable that a more favorable result would have occurred had the evidence been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) If the error was so egregious that it fundamentally impaired the fairness of a defendant's trial and thereby violated due process, the error is instead reviewed pursuant to the standard in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). Under *Chapman*, the reviewing court asks whether the constitutional error was harmless beyond a reasonable doubt. (*Id.* at p. 24.)

C.     Forfeiture

The People contend that defendant forfeited any challenge to the admissibility of the crime scene and autopsy photographs because he failed to object at trial. We agree. (*People v. Stevens*

(2015) 62 Cal.4th 325, 333 [failure to object to the admission of evidence at trial forfeits an appellate claim that that evidence was improperly admitted].) However, because defendant alleges that this forfeiture was caused by the ineffective assistance of his trial counsel, we exercise our discretion to reach the merits of his claims. (*People v. Crittenden* (1994) 9 Cal.4th 83, 146 (*Crittenden*) [courts may consider forfeited claims to forestall ineffective assistance of counsel arguments].)

D. <u>The trial court properly admitted evidence of the prior traffic violations</u>

Evidence of a defendant's "commission of other crimes, civil wrongs or bad acts is not admissible to show bad character or predisposition to criminality, but may be admitted to prove some material fact at issue such as . . . knowledge[.]" (*People v. Cage* (2015) 62 Cal.4th 256, 273 (*Cage*); Evid. Code, § 1101, subd. (b).) A trial court's discretionary decision to admit "other crimes evidence" for a permissible purpose cannot be "disturb[ed] . . . on appeal absent a showing that it exercised its discretion in an arbitrary manner resulting in a manifest miscarriage of justice." (*People v. Scully* (2021) 11 Cal.5th 542, 587 (*Scully*).)

Here, the prosecution proceeded on a theory of implied malice murder, which requires, among other things, that defendant "kn[e]w[] that his conduct endanger[ed] the life of another" and "act[ed] with conscious disregard for life." (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).) When a defendant is charged with implied malice murder after causing a fatal car accident, prior instances of reckless driving are admissible to prove that the defendant knew his driving was dangerous. (*People v. Ortiz* (2003) 109 Cal.App.4th 104, 112 (*Ortiz*) ["[C]ourts have recognized repeatedly that a motor vehicle driver's previous

13

encounters with the consequences of recklessness on the highway . . . sensitizes him to the dangerousness of such life-threatening conduct"].)

The 2020 accident and the 2021 traffic stop both show that, at the time of the fatal crash, defendant knew that his reckless driving—and particularly, speeding—endangered others. (See, e.g., *People v. Eagles* (1982) 133 Cal.App.3d 330, 338–340 (*Eagles*) [evidence that, on a prior occasion, a defendant had been seen speeding and weaving in and out of traffic was admissible in his trial for vehicular manslaughter].)

Moreover, the 2021 traffic stop demonstrates that despite causing a car crash by speeding seven months earlier, defendant persisted in driving recklessly by speeding and driving between lanes. And even though he received a verbal warning about speeding from the officer who pulled him over, two weeks later he was speeding again—this time in the street race that caused the fatal crash. The 2021 traffic stop thus illustrates defendant's "conscious disregard" for the lives he jeopardized by driving recklessly. (*Reyes*, *supra*, 14 Cal.5th at p. 988.) Accordingly, the trial court did not err in admitting evidence of these incidents.

Defendant raises four arguments against our conclusion. First, he argues that the prior incidents were too dissimilar to the fatal crash to shed light on defendant's knowledge of the risks posed by his actions. Defendant asserts, without explanation, that his "conduct on the night of the incident was qualitatively different than . . . speeding or driving at an unsafe speed[.]" He ignores that the fatal crash was caused by driving at unsafe speeds, which also led to both the 2020 accident and the 2021 traffic stop. In the 2020 accident, defendant rear-ended a car while speeding, the exact consequence of his racing the night of

14

the fatal crash. And, in any event, prior incidents of reckless driving need not be identical to demonstrate defendant's knowledge of the risks of such behavior. (*Ortiz*, *supra*, 109 Cal.App.4th at p. 112 [prior convictions for driving under the influence were relevant to show the defendant's knowledge of the risks of reckless driving, even though he was not intoxicated during the fatal accident].)[8]

Second, defendant contends that the prior incidents were not sufficiently severe to impress upon defendant the risks of reckless driving, citing, *People v. Saucedo* (2023) 90 Cal.App.5th 505 (*Saucedo*). In that case, an appellate court held that the defendant's prior acts of "speeding, spinning tires, failing to stop at a stop sign, driving on a sidewalk and stopping in an intersection, running a red light and driving without a license" were inadmissible to prove knowledge because "there [wa]s no evidence that [the defendant] suffered any serious consequences . . . [or] was ever required to attend any educational programs about the dangers of reckless driving." (*Id.* at p. 518.)

But defendant did experience serious consequences; in the 2020 accident, defendant rear-ended another car at high speed, and paramedics were called to the scene to assess the condition of the other driver. (See *Eagles*, *supra*, 133 Cal.App.3d at p. 340 ["'Evidence of excessive speed resulting in a near collision is relevant to knowledge of risk . . . of excessive speed'"]; contra,

---

[8]     Because we find the prior incidents were sufficiently similar to the crash, any error in the trial court's failure to "assess[] the similarities between the prior and current offenses" was harmless. (*Chapman*, *supra*, 386 U.S. at p. 24; *Watson*, *supra*, 46 Cal.2d at p. 836.)

15

*Saucedo*, *supra*, 90 Cal.App.5th at p. 518 [prior incidents inadmissible to prove knowledge of risk because "[t]here [wa]s no evidence that . . . [defendant] came close to injuring anyone" on those occasions].) Evidence of the 2020 accident was thus admissible to prove defendant's knowledge of the dangers posed by his driving.[9]

And, assuming arguendo that the verbal warning issued during the 2021 traffic stop was not a sufficiently severe consequence to notify defendant of the hazards of speeding, evidence of that incident was separately admissible to prove defendant's conscious disregard for human life.[10] (See *Cage*, *supra*, 62 Cal.4th at p. 273 [other act evidence is admissible to prove any "material fact at issue"].)

---

[9]     Defendant briefly argues that the prior incidents should have been excluded as cumulative because it is "basic knowledge" that "driving too fast for road conditions could result in an accident" (although defendant simultaneously insists that "his purported knowledge w[as] hotly contested at trial"). The case defendant cites for this proposition is inapposite, particularly given the plethora of authority approving the admission of multiple traffic priors in vehicular homicide cases. (Compare *People v. Hendrix* (2013) 214 Cal.App.4th 216, 243–244 [evidence of a defendant's prior contact with police officers was unnecessary to prove that he understood "rudimentary" facts about how officers interact with suspects] with *Ortiz*, *supra*, 109 Cal.App.4th at p. 110 [no error in admitting "seven past incidents in which [the] defendant had either been convicted of reckless driving, convicted of reckless drunk driving, or been observed driving recklessly"].)

[10]     Defendant does not argue that *Saucedo, supra,* 90 Cal.App.5th 505, or any other authority prohibits the use of the 2021 traffic stop to prove his conscious disregard for life.

16

Third, defendant claims that his testimony about initially fleeing the scene of the 2020 accident and later returning was irrelevant to establishing knowledge of risk and should have been excluded. Here again, defendant's statements go to his conscious disregard for human life rather than knowledge of risk. His account of the 2020 accident shows that defendant knew he should have stayed at the crash scene and "check[ed] [to] see if everyone was all right[;]" instead, he fled and did not return. Defendant even clarified that he only "stayed" at the 2020 accident "[be]cause [he] kn[e]w . . . it wasn't a big deal[,]" implying that he fled from the fatal car crash *because* he knew that it was a comparatively grievous accident. Defendant's testimony was thus properly admitted as evidence of his conscious disregard for the victims' lives.

Lastly, defendant tries to persuade us that he actually "had no prior reckless driving incidents" because (1) he presented expert testimony that he was not speeding in the 2020 accident and (2) he was not cited for speeding during the 2021 traffic stop. But the trial court instructed the jury that it was not obligated to believe defendant's reconstruction expert. (CALCRIM No. 332.) And a person's reckless driving need not be officially sanctioned to be admissible as other act evidence. (Evid. Code, § 1101, subd. (b) [evidence of "a crime, civil wrong, *or other act*" is admissible "to prove some fact . . . other than [a defendant's] disposition to commit such an act"].) [Italics added.]

E.  The trial court properly admitted the photographs into evidence

"'The applicable rule'" when admitting allegedly gruesome photographs "'is simply one of relevance, and the trial court has broad discretion in determining such relevance. [Citation.]

17

"'[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant'" [citation], and we rely on our trial courts to ensure that relevant, otherwise admissible evidence is not more prejudicial than probative [citation]. A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value.' [Citation.]" (*People v. Scully* (2021) 11 Cal.5th 542, 590 (*Scully*).)

"""To determine whether there was an abuse of discretion, we address two factors: (1) whether the photographs were relevant, and (2) whether the trial court abused its discretion in finding that the probative value of each photograph outweighed its prejudicial effect."' [Citation.]" (*Scully*, *supra*, 11 Cal.5th at p. 590.) Having examined all of the photographs, we find that the trial court did not abuse its discretion.

The crime scene photos "were relevant to corroborate and illustrate the testimony of several witnesses who saw the crime occur" and "the testimony of the investigating officers about the condition in which they found the crime scene[.]" (*Scully*, *supra*, 11 Cal.5th at pp. 590–591.)

They also shed light on defendant's state of mind in the immediate aftermath of the collision.[11] The crime scene photos show the staggering scale of the crash: the incinerated Corolla,

_____

[11] Regardless, trial courts are not obligated to exclude gruesome images just because, as defendant argues, they lack "specific probative value to the . . . theory of the case." (See, e.g., *People v. Johnson* (2015) 61 Cal.4th 734, 767 (*Johnson*) [no abuse of discretion in admitting a crime scene photograph that "'simply showed what had been done to the victim'"].)

the charred roadside, the severed limb in the road. These photographs make it clear that this was an extraordinarily dangerous accident. Notwithstanding defendant's testimony that he "didn't know what the outcome was[,]" it would have been obvious to anyone present that the people in the Corolla were seriously hurt.

Yet defendant did not attempt to help the victims or call emergency services. Instead, he tried to remove his personal effects from the Challenger, hopped into another car, and fled the scene. Given the magnitude of the wreck, as demonstrated by the crime scene photos, defendant's behavior evinces "a callous indifference to human life." (*People v. Palomar* (2020) 44 Cal.App.5th 969, 978 (*Palomar*) [failure to assist victims supports a defendant's conviction for implied malice murder].)

The autopsy photos were also relevant, as they illustrate the horrific manner of the victims' deaths and corroborate the coroner's testimony. (*People v. Marsh* (1985) 175 Cal.App.3d 987, 998 (*Marsh*) ["Gruesome or not, admission of relevant autopsy photographs is in the sound discretion of the trial court, even where they are only cumulatively used to graphically portray injuries already detailed in the testimony of a doctor witness"].) Such evidence is admissible even where, as here, the causes of death are undisputed and/or supported by nonpictorial evidence. (See *Scully*, *supra*, 11 Cal.5th at p. 591 ["'[A]utopsy photographs are routinely admitted to establish the nature and placement of the victim's wounds and to clarify . . . testimony . . . regarding the crime scene and the autopsy, even if other evidence may serve the same purposes'"]; *Johnson*, *supra*, 61 Cal.4th at p. 767 ["[T]he prosecution [i]s not obligated to "accept antiseptic stipulations in lieu of photographic evidence."' [Citation.]"].)

Moreover, the photographs were not unduly prejudicial. Multiple witnesses, including bystanders Torres and Ramirez, firefighter Koegler, and LASD Detective Sherman testified to the gravity of the collision and the severity of the injury to the victims. "[G]iven the witnesses' detailed description of the circumstances of the crime scene and the [victims'] condition[s], the photographs corroborating such testimony are not so gruesome or inflammatory as to have impermissibly swayed the jury." (*Scully*, *supra*, 11 Cal.5th at p. 591.)

Defendant urges us to follow *Marsh*, *supra*, 175 Cal.App.3d 987, arguing that, in that case, "the trial [court] violated section 352 [of the Evidence Code] by admitting autopsy photographs" where "the autopsy surgeon's testimony was adequate to make the prosecution's point." But in *Marsh*, the autopsy photographs not only had limited probative value, they were also unusually grisly and provocative. (*Marsh*, *supra*, 175 Cal.App.3d at p. 999 ["These photographs are gruesome solely because of the autopsy surgeon's handiwork . . . . In other words, their inflammatory nature has been greatly enhanced by the manner in which the surgeon chose to 'pose'" the victim's body].)

Defendant's case is distinguishable. As in other instances when autopsy photographs were properly admitted, the images "'"at issue here are gruesome because the charged offenses were gruesome, but they did no more than accurately portray the shocking nature of the crimes . . . .' [Citations.]"'" (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1272.) Although these photos, like all photographs of murder victims, are "disturbing" (*Scully*, *supra*, 11 Cal.5th at p. 591), the trial court did not abuse its discretion by admitting them.

20

F.   No prejudicial error in admitting evidence of the phone call

Assuming arguendo that the trial court erred by admitting evidence of the phone call, the error was harmless under any standard of review.  (*Chapman*, *supra*, 386 U.S. at p. 24; *Watson*, *supra*, 46 Cal.2d at p. 836.)  The record contains ample other evidence of defendant's indifference towards the victims: Although defendant testified that that he knew the accident was "bad", he made no attempt to help the victims at the scene or report the accident to authorities.  Instead, he tried to conceal evidence of his involvement by removing personal belongings from the Challenger, fleeing the scene of the crime, and, upon arrest, lying about his whereabouts the night of the crash. (*Palomar*, *supra*, 44 Cal.App.5th at p. 978 [failing to assist a wounded victim manifests "a callous indifference to human life"]; *People v. Famalaro* (2011) 52 Cal.4th 1, 35 [trier of fact may "infer consciousness of guilt from any attempts by defendant to conceal evidence"]; *People v. Leon* (2015) 61 Cal.4th 569, 607 [same, as to a defendant's flight after the crime].)  In the face of this evidence, the admission of the phone call, even if erroneous, was harmless beyond a reasonable doubt.  (*Chapman*, *supra*, 386 U.S. at p. 24.)

Defendant argues that the phone call fatally undermined his primary defense—namely, that his "impaired mental abilities . . . created reasonable doubt that he knew his actions posed a risk of death and acted in conscious disregard of human life."  He contends that the phone call was especially impactful because it carried the same weight as a confession, effectively using defendant's "own words . . . to shatter his defense."  (See *People v. Neal* (2003) 31 Cal.4th 63, 86 (*Neal*) [confessions are "'much more

21

likely to be affect the outcome of a trial than . . . other categories of evidence, and thus is much more likely to be prejudicial . . . .'"].)

But even if we accepted defendant's analogy, the phone call was not the only piece of evidence that undercut his defense.  The record is replete with other statements by defendant that contradict his impairment defense.  Shortly after his arrest, defendant told detectives that street racing and speeding on public roadways was "dangerous" because "[o]ther people['s] life besides your life is in your hands[.]"  At trial, defendant confirmed that, at the time of the accident, he knew that street racing at 130 miles per hour was dangerous.

Defendant also testified that after causing a prior, less severe traffic accident, he returned to the scene shortly after fleeing "to check and see if everyone was all right[;]" yet he did not do the same after this crash, which was far more injurious.  He said that he "stayed" for "the first one" "[be]cause [he] kn[e]w . . . it wasn't a big deal."  But at the fatal crash, he "knew it was bad" and left without ever returning or reporting the accident to authorities.  He later lied to detectives about where he was the night of the accident "[b]ecause . . . [he] didn't want to go to jail."

These statements, combined with defendant's behavior immediately following the crash, show that he "'"'kn[e]w that his conduct endanger[ed] the li[ves] of []other[s] and . . . act[ed] with conscious disregard for life[,]'"'"' the state of mind necessary to convict him of implied malice murder.  (*Reyes, supra,* 14 Cal.5th at p. 988 (*Reyes*) [internal citations omitted].)  The phone call was ultimately "'unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.]"  (*Neal, supra*, 31 Cal.4th at p. 87.)  Thus, any

assumed error in the phone call's admission was harmless beyond a reasonable doubt.

II.     *Alleged denial of the right to effective counsel*

Defendant alleges that he was denied his constitutional right to effective counsel because of his trial attorney's failure to object to the prosecutor's misstatements of law during closing arguments.

A.     <u>Applicable law</u>

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.  [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.  [Citation.]'" (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*).)

"A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel." (*People v. Lopez* (2008) 42 Cal.4th 960, 966.)  To establish ineffective assistance of counsel, a defendant must show, by a preponderance of the evidence, that his counsel's representation fell below the standard of a competent advocate, and a reasonable probability exists that, but for counsel's errors, the result would have been different.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 216–218 (*Ledesma*).)

B.    Standard of review

In determining whether counsel's performance was deficient, we exercise deferential scrutiny and "assess the reasonableness of counsel's acts or omissions . . . under the circumstances as they stood at the time that counsel acted or failed to act." (*Ledesma, supra,* 43 Cal.3d at p. 216.)  We must reject a claim of ineffective assistance of counsel "if the record sheds no light on why counsel acted or failed to act in the manner challenged unless (1) counsel was asked for and failed to provide a satisfactory explanation or (2) there simply could be no satisfactory explanation." (*People v. Burgener* (2003) 29 Cal.4th 833, 880 (*Burgener*).)

C.    Analysis

Defendant alleges that the prosecutor committed misconduct by saying the following in the rebuttal portion of her closing argument:

"[I]mplied malice murder can be an accident.  I submit to you that that is exactly what [it] [is] because the intent is not to hurt or kill somebody.  It's your actions.  [R]egardless of what you thought might happen, your actions are so dangerous that the natural and probable consequences could be that somebody dies. [¶]  . . . The problem is the action that you did that caused the deaths.  That's what you have to consider.  That's what the intent is about.  In this case, it is not if he was braking; it is whether or not he was speeding, and excessive speed at that, and whether or not he was racing.  And are those intentional actions, the ones that he disregarded, making it a murder?  [¶]  . . . [A] mental state . . . must be formed before the act that causes the death is committed.  Again, in this case, the speeding."

Defendant urges us to read this segment of the prosecutor's rebuttal argument in a vacuum, which we cannot do. (*Centeno*, *supra*, 60 Cal.4th at p. 667.) He argues that this portion of the closing argument caused the jury to misunderstand the law of implied malice, by characterizing implied malice murders as "accidents" and by minimizing the importance of defendant's mental state. But, read in context, there is no "'reasonable likelihood'" that the jury understood the prosecutor's comments as defendant does. (*Ibid.*)

The prosecutor used the word "accident" to communicate that a perpetrator of implied malice murder does not set out to kill someone; instead, they deliberately commit an act, the natural and probable consequences of which are dangerous to life. The intent requirement (i.e., deliberation) attaches to the act (i.e., speeding), not the consequence of the act (i.e., the death of another). That is a correct statement of the law. (*Reyes*, *supra*, 14 Cal.5th at p. 988.)

Later in her rebuttal argument, the prosecutor told the jury "the four things [it] need[ed] to consider for implied malice" were whether (1) "defendant intentionally committed the act . . . [of] racing and speeding"; (2) "the natural and probable consequences of that act are dangerous to human life"; (3) defendant "kn[e]w that it was dangerous"; and (4) defendant "deliberately d[id] that act with a conscious disregard for human life." This language is lifted almost verbatim from the standard jury instruction on implied malice. (CALCRIM No. 520.)

Additionally, the jury was properly instructed on the required elements of implied malice murder. And the trial court told the jury that "[i]f the attorneys discuss the law and it is different from my instructions on the law, you must rely on the

law as I have stated it to you." We presume the jury followed the trial court's instructions. (*People v. Bennett* (2009) 45 Cal.4th 577, 596.)

Accordingly, there was a perfectly "satisfactory explanation" (*Burgener, supra,* 29 Cal.4th at p. 880) for defense counsel's failure to speak up at trial: There was no prosecutorial misconduct to which he could object. (*People v. Memro* (1995) 11 Cal.4th 786, 834 ["The Sixth Amendment does not require counsel "'to waste the court's time with futile or frivolous motions.'" [Citation.]"].) Defendant's right to effective assistance of counsel was not violated.

III.    *Alleged instructional error*

Defendant claims that the trial court should have instructed the jury on vehicular manslaughter with gross negligence.

He concedes that the trial court was not obligated to do so, as our Supreme Court has held that vehicular manslaughter is not a lesser included offense of second degree murder. (*People v. Sanchez* (2001) 24 Cal.4th 983, 989 [gross vehicular manslaughter while intoxicated is not a lesser included offense of second degree murder], overruled on another point in *People v. Reed* (2006) 38 Cal.4th 1224, 1228–1229; see also *People v. Bettasso* (2020) 49 Cal.App.5th 1050, 1058 [vehicular manslaughter is not a lesser included offense of second degree murder].)

Nonetheless, defendant asks us to "recommend that the California Supreme Court provide a mechanism that allows the jury to consider whether a defendant charged with murder based on vehicular homicide is actually guilty of vehicular manslaughter instead."

26

We must decline defendant's invitation. We are bound by the opinions of our Supreme Court (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity Sales*)), and do not give advisory opinions about settled propositions (*Vandermost v. Bowen* (2012) 53 Cal.4th 421, 452).

IV. *Alleged cumulative error*

Defendant contends that his conviction should be reversed due to cumulative error. As set forth above, defendant has failed to demonstrate any reversible error in his conviction. To the extent we have assumed error for purposes of analysis, none of these errors increases the impact of any other and their cumulative impact did not deprive defendant of a fair trial or the right to due process. (See *People v. Thomas* (2011) 51 Cal.4th 449, 508.)

V. *Alleged sentencing errors*

A. <u>Consecutive sentences for murder convictions</u>

Defendant argues that the trial court abused its discretion by imposing consecutive sentences for each of his murder convictions; "because he did not harbor a separate culpable intent as to each victim," defendant urges that "he should not be sentenced to consecutive terms based on a single act . . . that resulted in two deaths." Our Supreme Court disagrees with him. (*People v. Calhoun* (2007) 40 Cal.4th 398, 408 ["a consecutive sentence" is proper when a defendant's "single act of violence caused either the death or serious injury of [multiple] people[,]" as "[t]he gravity of and his culpability for this offense is increased by the number of those he harmed"].) We reiterate that we must follow Supreme Court precedent, and thus decline to entertain defendant's arguments against it. (*Auto Equity Sales*, *supra*, 57 Cal.2d at p. 455.)

27

B.    Determinate terms

Finally, defendant alleges that the trial court erred by imposing maximum and consecutive sentences on each of his determinate terms.[12]

1.    *Applicable law*

When imposing a determinate sentence for an offense that carries three possible terms of imprisonment, the trial court "shall," in its discretion, impose a sentence "not to exceed the middle term."  (§ 1170, subd. (b)(1).)  It may only impose the upper term if "there are circumstances in aggravation of the crime that justify [its] imposition[,]" and "the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."  (§ 1170, subd. (b)(2).)

2.    *Standard of review*

We review sentencing decisions for abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847, superseded by statute on another ground as stated in *People v. Lynch* (2024) 16 Cal.5th 730 (*Lynch*).)  A court abuses its sentencing discretion when it acts arbitrarily and capriciously, relies on improper considerations in reaching its decision, or is unaware of the scope of its discretion so that it does not exercise informed discretion at all.  (*People v. Panozo* (2021) 59 Cal.App.5th 825, 837.)

---

[12]    The prosecution argues that defendant forfeited his sentencing claims; because defendant again argues that any forfeiture was caused by ineffective assistance of counsel, we reach the merits of his argument.  (*Crittenden, supra*, 9 Cal.4th at p. 146.)

28

### 3. *The matter is remanded for resentencing*

Under section 1170, subdivision (b)(2), error "occurs when the trial court relies on unproven aggravating facts to impose an upper term sentence, even if some other aggravating facts relied on have been properly established." (*Lynch*, *supra*, 16 Cal.5th at p. 768.)

Here, the factors in aggravation listed by the trial court were that "th[e] crime involved great violence, great bodily harm and other acts disclosing a high degree of cruelty, viciousness and callousness[;]" defendant's "prior convictions including sustained petitions in juvenile delinquency proceedings are of increase in seriousness[;]" and that "the manner in which the crime was carried out indicates planning, sophistication or professionalism."

The People concede that "none of the[se] aggravating circumstances were established as required by section 1170, subdivision (b)." However, they contend that this error should be held harmless.

Sentencing errors under section 1170, subdivision (b)(2), are subject to harmless error review under the standard set forth in *Chapman*, *supra*, 386 U.S. at page 24. (*Lynch*, *supra*, 16 Cal.5th at p. 750.) Such errors are not prejudicial if "an appellate court can conclude beyond a reasonable doubt that a jury would have found true all of the aggravating facts relied upon by the trial court to justify an upper term sentence, or that those facts were otherwise proved true in compliance with the current statutory requirements." (*Lynch*, *supra*, 16 Cal.5th at p. 768.)

Under the circumstances of this case, we are satisfied beyond a reasonable doubt that the jury would have found two of the aggravating factors listed by the trial court to be true: Defendant's increasingly serious criminal history is proven by his probation report, the accuracy of which was never contested by defendant.  And, given the jury's verdict, it would have found that defendant exhibited a high degree of callousness.  (Contra, *Lynch*, *supra*, 16 Cal.5th at p. 776 [holding the jury would not necessarily have found this factor true since it acquitted the defendant of the most serious charge against him].)

But we cannot say the same of the final factor, namely the defendant's planning, sophistication, or professionalism in carrying out the crimes.  The trial court found this factor present because defendant removed some personal belongings from the Challenger before fleeing the crime scene, without trying to help the victims.  Looking at the same information, the jury could have reached the opposite finding.  Defendant's panicked flight, and his failure to remove a crucial piece of identifying information from the Challenger (namely, his state identification card), could equally reflect his youth, inexperience, and failure to make an adequate escape plan in the event of a disaster like the fatal car crash.

"Because we cannot find the omission of a jury trial harmless beyond a reasonable doubt as to *every* aggravating fact relied upon by the trial court to impose an upper term, [defendant's] sentence must be reversed.  "'The proper remedy for this type of failure of proof—where . . . [aggravating facts] were 'never tried' to the jury—is to remand and give the People an

opportunity to retry'" the aggravating facts. [Citation.]"[13] (*Lynch*, *supra*, 16 Cal.5th at p. 776.)

We therefore remand for resentencing. "On remand, the parties remain free to introduce at trial all relevant evidence to support or contest the factual support for the aggravating circumstances set out in the California Rules of Court. The court may rely on any properly proven aggravating facts, including prior convictions or facts necessarily found by the jury to support a verdict on underlying counts and enhancements. The court retains its discretion to impose an upper term sentence if it concludes that one or more properly proved circumstances justify such a sentence. [Citation.] If it cannot so conclude, it may impose no more than a middle term for" counts 3 and 5. (*Lynch*, *supra*, 16 Cal.5th at pp. 777–778.)

---

[13] Because we remand for resentencing on this ground, we need not address defendant's parallel argument that remand is required under section 1170, subdivision (b)(6). (See *People v. Lua* (2017) 10 Cal.App.5th 1004, 1021 [appellate court's conclusion that remand was required rendered moot other arguments raised on appeal regarding the sentence].)

**DISPOSITION**

The sentence is reversed, and the matter is remanded to the trial court for resentencing. In all other respects, the judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
LUI


_____, J.*
HOFFSTADT

---

\*　　Justice of the Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.